Clara M. Schneider v. Commissioner.
Schneider v. Commissioner
Docket No. 30785.
United States Tax Court
1952 Tax Ct. Memo LEXIS 3; 11 T.C.M. (CCH) 1232; T.C.M. (RIA) 53005; December 31, 1952
C. W. H. Bangs, Esq., for the petitioner. Elmer E. Lyon, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent determined against petitioner deficiencies in income tax and additions for fraud under section 293 (b) as follows: Taxable Year
Income Tax
Penalty
1944
$1,093.57
$ 546.79
1945
1,630.78
817.71
1946
1,699.77
849.89
1948
5,367.82
2,683.91 By amended answer respondent seeks *4 an increase in taxes and penalty for the taxable year 1948 in the respective amounts of $961.44 and $480.72. Petitioner contests both the income tax deficiencies and the penalties. Findings of Fact Petitioner is an individual and resides at Fort Wayne, Indiana. She filed her income tax returns for the years involved with the collector of internal revenue for the district of Indiana. Petitioner was a masseuse and during the period between 1944 and 1949 was known as a naturopath-physician. She also maintained offices in the Stevens Building in Chicago, Illinois, from 1945 until sometime in 1950, making one trip each week to Chicago to treat patients referred to her from doctors in Chicago. In her application for rental of the offices she showed the business to be conducted as "osteopath" which word appeared on the front door of the offices. Petitioner was married to Ross Arnold and they resided in Fort Wayne, Indiana. They had three children, Nelson, Hubert and Elizabeth. On or about November 14, 1928, petitioner and Arnold were divorced and petitioner was awarded the custody of Elizabeth who at that time was twelve years of age. The court ordered Arnold to pay petitioner $25 per *5 month for the support of Elizabeth. After the divorce petitioner returned to her former husband's home and kept house for him and the children for a number of months. Petitioner then became the housekeeper for Dr. Adam L. Schneider of Fort Wayne sometime in 1929. Dr. Schneider permitted petitioner to bring her daughter Elizabeth with her and he paid petitioner $10 per week for her work as housekeeper. In addition, Dr. Schneider gave petitioner money with which to buy groceries. He paid the utilities and other bills. She was permitted to charge certain items to Dr. Schneider's account. In 1933 or 1934 she bought ten shares of Lincoln Life Insurance Company stock at $40 a share. This was paid for out of her savings. About May 1935, Dr. Schneider deposited $2,000 in the Peoples Trust & Savings Company of Fort Wayne to the joint account of petitioner, whose name at that time was Clara Arnold, and her daughter, Elizabeth Arnold. On August 8, 1935, petitioner and Dr. Schneider were married, after having executed an antenuptial agreement. The agreement provided inter alia that the doctor's residence at 1205 E. Lewis Street, Fort Wayne, would be conveyed by Dr. Schneider to petitioner, reserving *6 unto himself a life estate, and that Dr. Schneider would convey unto petitioner, after the solemnization of the intended marriage, fifty-five shares of common stock of the Fort Wayne Corrugated Paper Company of the approximate value of $5,000. The following provision also appears in the agreement: "In consideration of the conveyance and transfer to her of said real and personal property the party of the second part agrees that she will accept the same in lieu of any and all rights and claims of dower, inheritance, and descent in and to the real property of the first party now owned, or hereafter acquired or in lieu of any and all rights or claims to a distributive share of his personal estate now owned, or hereafter acquired and in lieu of any and all other claims which may arise and accrue to her by reason of said marriage; the party of the second part hereby releases, remises, and relinquishes to the party of the first part, her heirs, successors, administrators and assigns forever, all the interest, title and claim therein set out." Concurrently with the execution of the antenuptial agreement and in accordance with its provisions, the Lewis Street property was conveyed to petitioner. *7 Before conveying to petitioner the fifty-five shares of the Fort Wayne Corrugated Paper Company stock Dr. Schneider was killed in an automobile accident, November 5, 1935. The executor of the estate of Dr. Schneider, by order of the court dated August 26, 1936, delivered to petitioner the fifty-five shares of the stock. At that time, the stock was appraised at $5,500. Dr. Schneider left an estate of approximately $72,000 and at the date of his death he had $184 cash in a safe and on his person, a checking account in Peoples Trust & Savings Company in the amount of $1,550.20 and a savings account in the same bank in the amount of $23,532.42. His heirs consisted of an adult daughter, Ruth I. Schneider, and four granddaughters, children of Lawrence B. Schneider, deceased son. After the doctor's death petitioner began to give massages and baths, and also did some sewing. During the summer of 1936 petitioner took a four-months course in physiotherapy in Chicago, Illinois. In 1937 she took a course of training at Battle Creek College, Battle Creek, Michigan. She took the summer course starting in June and enrolled for the fall term but in November she dropped out of the college. Elizabeth *8 also attended the college and lived with her mother. During the same year, 1937, petitioner sold the Lewis Street property to Tressie High for $4,250 on contract, receiving $750 as a down payment together with an agreement from the purchaser to make payments of $35 per month with interest at the rate of six per cent. She also sold her Fort Wayne Corrugated Paper Company stock for about $170 per share. Subsequent to the sale of the stock and in the same year, 1937, she bought property on Englewood Court for $6,800 cash. Petitioner also bought a house in Battle Creek, Michigan, in 1937, for $4,500 on a contract basis. Subsequently she sold this property on contract for the same price and the contract was paid out four or five years later. While in Battle Creek she had not done much outside work and spent more than she earned. Petitioner returned to Fort Wayne the latter part of 1937 and attended a chiropractic school there. Shortly after her return, in 1937, she sold the Englewood Court property for $7,500 on a contract, receiving a down payment of $1,500 with an agreement from the purchaser to make payments of $60 per month. The purchaser, in 1940, obtained a mortgage on that property *9 and paid petitioner the balance on the contract of $4,000. At approximately the same time petitioner bought property on Buell Drive for $5,000 cash. This was immediately sold on contract for $5,000, petitioner receiving a down payment of $500 and an agreement from the purchaser to make payments of $45 per month. Buying and selling this property was a financial transaction in which her only concern was the six per cent per annum interest she would receive. Late in 1940 or early in 1941 she sold her ten shares of Lincoln Life Insurance Company stock for about $450. During the periods petitioner was not taking the summer courses, or while attending school at night, she worked by giving massages and baths. Sometime after 1937 petitioner took a course in beginner's college chemistry at the Extension Department of the University of Indiana, which department was located in Fort Wayne. In 1943, petitioner bought a residence located at 4633 Tacoma Avenue, in South Wood Park Addition, for $10,500. This property was purchased on contract with a down payment of $2,000 cash. In 1945 petitioner paid the purchase price down to where she was able to obtain a mortgage loan on this property from *10 the Indianapolis Life Insurance Company in the principal amount of $5,600. In 1945 petitioner sold her Tacoma Avenue property for approximately $13,000 and paid off the mortgage on it. On February 16, 1945, petitioner purchased a farm of about 69 acres near Fort Wayne, for her son, taking title in her own name. The purchase price was $8,500. The deed was recorded July 6, 1945. On February 28, 1945, petitioner purchased from the same grantors a tract of land of approximately 86 acres, adjoining the farm previously purchased, taking the title in her name. The purchase price was $6,500. The deed was recorded April 15, 1946. Petitioner's son, Nelson Arnold, furnished petitioner with a down payment of $1,000 and the following week gave her approximately $1,700. Petitioner furnished enough of her money to obtain a mortgage loan on the first farm purchased, from the John Hancock Life Insurance Company in the original amount of $3,850. The second farm tract was purchased on contract with petitioner making a down payment of $500. Monthly payments of $50 were paid to Churubusco Bank. During 1946 petitioner borrowed $2,500 from her mother, Elizabeth Sprinkle, which petitioner applied toward *11 the payment on the contract of purchase of the second farm. She also paid the monthly installments for a year and a half. During 1947 Nelson Arnold borrowed $2,500 from his father and paid his mother for some of the money she had put into the two farms. He lived on the farm, made some improvements and kept up the repairs. He also paid the taxes and insurance and retained what crops that were produced. From July 1941 to September 1946, petitioner rented offices at 206 E. Jefferson Street. During 1946 she purchased an old residence located at 225 E. Jefferson Street, to which she moved her offices, converting the two front rooms into a joint reception and waiting room. This property was purchased on a contract basis of $14,200, petitioner agreeing to make payments of $100 per month. No other business was conducted in the building. Petitioner prior to 1944, charged her patients $2 a treatment. This was raised to $3 and then to $5. After raising her charge to $5 per treatment she charged for repeat calls $2, which was later raised to $3. She charged for her treatments in Chicago $10 per treatment and $5 for repeat calls by children. Subsequently, she made straight charges of $10 for *12 adults and $5 for children. On February 26, 1948, petitioner purchased her present residence located at 1125 Illsley Drive, Fort Wayne, on a contract basis, the purchase price being $19,500. She made a down payment of $5,000 cash and agreed to pay the balance in monthly payments of $125. During the year 1948 petitioner obtained a mortgage loan on her Illsley Drive residence from the Home Loan & Savings Association at Fort Wayne and with the proceeds of this loan paid off the contract balance then owing on her home. Also during 1948 petitioner advanced a total sum of $14,400 to her daughter, Elizabeth, who was living in Middlesex County, Massachusetts, and a residence located at 40 Westland Avenue, Winchester, Massachusetts, was purchased with Elizabeth and her husband and petitioner as joint tenants. On October 18, 1945, petitioner made application with Columbus Venetian Stevens Buildings, Inc., Chicago, Illinois, for rental of office space in the Stevens Building. Among the statements made in the application which was signed by petitioner are the following: "Business to be conducted: Osteopath References: Bank - checking - Anthony Wayne Bank, Fort Wayne, Indiana." With the *13 application petitioner gave a statement of her financial condition as follows: "Real Estate
Location: Farm located two miles
east of Churubusco, Indiana, on
Road 205
Value
$15,000
Mortgage
3,600
Net Value
$11,400
Merchandise
None
Fixtures
None
Bills Receivable
None
Cash
1,000
Other Assets
None
Other Assets
None
Total Assets
$12,400
Total Liabilities
None
Net Assets
$12,400
The above is a correct statement."
The above statement was followed by petitioner's signature and Fort Wayne address. During 1948 the Indiana Board of Medical Registration conducted an investigation of the professional activities of petitioner. One of the investigators observed the office hours and people coming in and out of the petitioner's office several times during the year. The people appeared to be from all walks of life. On February 10, 1948, from 7:30 A.M. to 9:48 A.M., forty-two individuals were observed entering petitioner's premises and during the same period eighteen people left the premises. On May 18, thirty-four persons were observed entering the premises between the hours of 8:03 A.M., and 9:58 A.M. About May, 1948, petitioner *14 was served with an injunction notice, instigated by the Indiana Board of Medical Registration, which action is still pending. The investigation and legal action led to publicity in the local newspapers. Although her number of patients decreased because of the publicity she found she did not have so many to talk with and have to turn them away, which really permitted her to treat more patients than she had been able to treat before and this in effect increased her income. Petitioner kept no books or records of her business receipts and expenditures during the period in question. During this period she had a checking account at the Peoples Trust & Savings Company and she had a savings account in the amount of $100 from 1943 to 1946, inclusive, at the Anthony Wayne Bank. Petitioner made no regular deposits in her checking account as it was not convenient for her to do so and she did not want people to find out about her business. Petitioner's assets, liabilities and net worth for the years involved were as follows: ASSETS
1943
1944
1945
1946
1947
1948
CASH
Checking account
$ 196.35
$ 1,398.35
$ 2,957.80
$ 2,017.80
$ 108.32
$ 378.53
Savings account
100.00
100.00
100.00
100.00
none
none
CONTRACT RECEIVABLE
Lewis Street property
650.00
350.00
none
REAL ESTATE
Tacoma Avenue property
10,500.00
10,500.00
none
Illsley Drive property
none
19,500.00
19,500.00
19,500.00
19,500.00
East Jefferson Street property
none
14,200.00
14,700.00
14,700.00
First farm tract
none
5,800.00
5,800.00
3,300.00
3,300.00
Second farm tract
6,500.00
6,500.00
6,500.00
6,500.00
Winchester, Mass., property
none
14,400.00
Totals
$11,446.35
$12,348.35
$34,857.80
$48,117.80
$44,108.32
58,778.53
LIABILITIES
PERSONAL LOANS PAYABLE
Elizabeth Sprinkle
none
2,500.00
2,500.00
2,500.00
CONTRACTS PAYABLE
Second farm tract
none
5,500.00
Illsley Drive property
none
14,370.84
13,579.62
12,748.34
none
East Jefferson Street property
14,973.00
12,870.00
11,875.00
MORTGAGES PAYABLE
Tacoma Street property
5,525.72
3,648.52
Illsley Drive property
9,588.97
First farm tract
3,650.00
3,550.00
3,450.00
3,350.00
Reserve for depreciation
142.00
588.00
1,034.00
Totals
$ 5,525.72
$ 3,648.52
$23,520.84
$34,744.62
$32,156.34
$28,347.97
Net Worth
5,920.63
8,699.83
11,336.96
13,373.18
11,951.98
30,430.56
Totals
$11,446.35
$12,348.45
$34,857.80
$48,117.80
$44,108.32
$58,778.53
*15 Petitioner's increased net worth, personal expenses, taxable income, deductions, income reported and additional income not reported for the years involved were as follows: 1943
1944
1945
1946
1947
1948
Net Worth
$5,920.63
$8,699.83
$11,336.96
$13,373.18
$11,951.98
$30,430.56
Increase in Net Worth
2,779.20
2,637.13
2,036.22
18,478.58
Personal Expenses
2,795.68
3,955.65
6,764.42
4,205.94
Taxable Income
$5,574.88
$ 6,592.78
$ 8,800.64
$22,684.52
Less 50% capital gain on sale of residence
964.75
$ 5,628.03
Less deductions as on returns
334.83
360.52
975.09
Net Income
$5,240.05
$ 5,267.51
$7,825.55
$22,684.52
Net Income as reported on returns
852.19
2,190.72
1,908.98
Adjusted Gross Income as reported on return
4,260.09
Additional Income not reported
$4,387.86
$ 3,076.79
$ 5,916.57
$18,424.43
Part of the deficiency for each of the taxable years is due to fraud with intent to evade tax. Opinion Respondent determined petitioner's taxable income for the years involved by the use of the increase in net worth, plus personal living expenses, method. This is permissible *16 where the taxpayer has failed to keep books and records that properly reflect his true income. Section 41, Internal Revenue Code[1]; Regulations 111, Section 29.41-1 [2] ; Harris v. Commissioner, 174 Fed. (2d) 70. *17 In computing petitioner's net worth for the taxable years respondent has determined for each year petitioner's assets and liabilities, based primarily on real estate holdings and outstanding indebtedness owing on them, and to the net worth determined he has added an amount for the respective years to cover the living expenses of petitioner. Petitioner has not challenged respondent's determination of living expenses and has agreed to the majority of assets and liabilities as found by respondent. The items upon which the parties disagree are (1) the amount of cash that petitioner claims was left with her by her husband, which she states was on hand at the time of his death and which, she maintains, she kept practically intact through the years extending from 1935 to 1948; and (2) the value of petitioner's interest, if any, in the farm tracts she purchased for her son. 1. Respondent has not found that petitioner had an asset of $10,000 or $12,000 cash in her home at any time during the years involved. Petitioner maintains that at the time her husband was killed he had brought home cash amounts totaling over $12,000, that she had kept that amount in her home from that date through *18 1943, that she had $11,000 of it in 1944, $10,000 in 1945, $12,000 in 1946 and 1947 and none of it in 1948. She testified that when the banks closed in 1933, Dr. Schneider brought home $3,000, which he had kept in a safe at his office, and requested petitioner to take care of it, explaining that he had been unable to get any money from his bank account and did not want to be caught in that condition again; that between that date and his death in November 1935, he had brought home other amounts which brought the total in her possession to over $12,000; that he was scared of the banks and that he wanted to have money with which he could give assistance to four grandchildren, whose father, the doctor's son, had died two years previously. There is no evidence to substantiate such statements, but there are facts and circumstances that negate them. It is not explained why petitioner could keep money more safely at home than the doctor could in a safe at his office. If he had been keeping money in his safe before the banks closed, there is no reason given for not continuing to do so after the bank closures. It is not shown that the doctor had suffered any loss because of the closing of *19 a bank or any other reason why he would not risk his money in a bank. To the contrary, the evidence shows that at his death he had cash on his person and in his safe in the comparatively small amount of $184, but a checking account of $1,500 and a savings account of over $23,000. Furthermore, in May 1935, for a reason not explained, the doctor turned over to petitioner and her daughter $2,000. This he did not do by delivering the cash to her for safe-keeping but by making a deposit to the joint account of petitioner and her daughter in the same bank where his checking and savings accounts were maintained, and this was done at a time when she, and he, are alleged to have had $12,000 cash in their home. The execution of the antenuptial agreement concurrently with the marriage of the doctor and petitioner was intended to limit petitioner, in lieu of dower rights, to the possession of his home and 55 shares of certain stock. At that time the home was valued at approximately $4,250, the amount for which the property was later sold and the stock was stated in the agreement to be of the value of approximately $5,000, and which was appraised in the doctor's estate at $5,500. Since the doctor *20 had an estate, exclusive of the home and the aforementioned stock, of about $72,000, of which about $25,000 was in cash, none of which estate petitioner claimed, it would appear, under the conditions, that the doctor would not fail to take into consideration in the agreement an asset in cash of approximately half the amount he had in his savings account, and which also was as much as, and $3,000 more, than the value of property he agreed to give her. Rather, it would seem from the business judgment he showed in making investments, of having most of his cash in a savings account and the execution of the agreement in settlement of the property rights of his wife-to-be in his estate he would have preferred to have had such an amount as $12,000 in his savings account or invested in some manner. Petitioner was very vague on the amount of cash she had on hand from the death of her husband until she had none of it in 1948; in fact, she admitted she never knew the exact amount at any time, nor did she know how much of it she had spent in those years when the cash was alleged to have been reduced to approximately $11,000 and $10,000; nor did she state clearly how much was spent, where and *21 when, in 1948, the year in which the entire amount of $12,000 is alleged to have been expended. During the course of time after petitioner sold her home and stock, she made investments; also, found it necessary to borrow money but despite her apparent desire to make money from her investments and to save interest on money she owed, she never used any of the cash that was available over a period of at least ten years. Her testimony on the above matters appears to lack the substance of reality. There is no need to prolong this discussion further. We think the evidence strongly supports respondent in his elimination from petitioner's assets the cash items claimed by petitioner to have been in her possession prior to and since the death of her husband. 2. The parties disagree with respect to petitioner's interest in the farm tracts purchased by petitioner for her son, Nelson Arnold, but title to which was taken in her name and has so remained until the present time, as far as the record shows. Respondent has given petitioner credit of $2,700 as having been paid to her by her son, which was presumably paid on the purchase price of the first farm tract in 1945 and also he has given her *22 credit of $2,500 as having been paid by the son to his mother in 1947 for money she had expended in purchasing the farm, and which $2,500 he had borrowed, on his note, from his father. Presumably, the credit was based on the testimony adduced by the mother and son and the $2,500 note in evidence, although it is not clear that the entire amount borrowed from his father was paid to petitioner. The evidence is not clear and convincing that petitioner had no financial interest in the property in 1948 and not more than the amount of $3,050 she claimed as her interest in the farm during 1945, 1946 and 1947. Petitioner and her son testified that the property was bought for him, that while petitioner helped financially she had been reimbursed by him, and that title was taken in her name in order to protect him from his wife, and particularly his mother-in-law, who had at one time caused him and his wife to be separated for a year and one-half. For this reason it is argued, if she caused any further trouble between him and his wife, they would not be able to reach his property. The record reveals, however, that the separation between Arnold and his wife occurred prior to 1937, that they were *23 reunited in that year, that the farm was purchased eight years later, in 1945, that at that time the mother-in-law was living with them and that the wife, who kept the books and records relating to the farm knew, at least, sometime after 1945 how the farm was acquired and paid for. It is argued that petitioner was merely holding the property in trust for her son, Nelson, that she was secured for the money advanced by the deed, that he was in possession of the property, that he had paid taxes and insurance, made repairs and improvements and his mother did not share in any crops or produce from the farm. Again, this does not convince us that she had no interest in the property. There is nothing in the two deeds that shows any interest of Nelson Arnold in the property; it was petitioner who signed the original contracts of purchase; it was through her that the balance due on the first contract was paid in 1946; it was she who made the down payment of $500 on the second piece of property; it was through her that the balance on the contract was reduced to where an insurance loan could be obtained; and, it was she who signed the mortgage in securing the loan. Except for the oral statement *24 of petitioner and her son, both being parties of interest, there is no evidence of any other payments being made to petitioner or to anyone else by Nelson on the contracts of purchase or on the outstanding mortgage. It is difficult to understand, too, how Nelson and his wife, knowing all the circumstances relating to the acquisition of the farm, are willing to leave title in another, when, as claimed, he had paid for it; when there is nothing to show his ownership; and when, if his mother should predecease him, there would be other children to share in the mother's estate, including the farm property. Nor, can we understand that Nelson could maintain a position that his wife should not have at least her dower interest in the farm, should he predecease his mother, particularly after the wife had been of such help to him in operating the farm as he testified. Again, the realities of the situation are contrary to the testimony of petitioner and her son. Considering all the circumstances, we conclude that petitioner had an interest in the farm to the financial extent we have found, in our findings of fact, for the years as respectively shown. Petitioner, on brief, in computing her net *25 worth included in her liabilities a reserve for depreciation on her respective homes and the Winchester, Massachusetts, property and also on a furnace and stoker in her office building. As she offered no proof, there is no evidence on which to base findings of fact on these items and consequently they are not included in our findings of fact. The parties are in agreement on the items of depreciation relating to petitioner's office building. In so far as the deficiencies in tax are concerned, petitioner, in our judgment, has failed to meet her burden of proof and the tax liability will, therefore, be determined in accordance with our findings of fact. Our final question is whether petitioner should be charged with a fraud penalty, as provided by section 293 (b) of the Internal Revenue Code. [3]
*26 It is respondent's burden to prove by clear and convincing evidence that some part of the deficiencies is due to fraud, with intent to evade tax. Section 1112, Internal Revenue Code. In our opinion respondent has met his burden. "To establish fraud by direct proof of intention is seldom possible. Usually it must be gleaned from the several transactions in question and the conduct of the taxpayer relative thereto." M. Rea Gano, 19 B.T.A., 518, 532; Arlette Coat Co., 14 T.C. 751, 756. Petitioner claims that she reported all her income for the respective years in question on her income tax returns. It appears, however, that she did not. Petitioner appears to have been successful both in her business and in her investments. She has received income in substantial amounts, and has failed to report substantial amounts. She kept no books or records. In fact, she appears to have deliberately refrained from doing so, in order to prevent the Indiana Medical Board of Registration from knowing what her business was or how much income she was receiving, which operations, to say the least, prevented her from reporting her true income *27 or to permit respondent to obtain the facts relating thereto. Petitioner reported income on her returns for the taxable years as follows: Net income for 1944, 1945 and 1946 in the respective amounts of $852.19, $2,190.72 and $1,908.98, and adjusted gross income for 1948 in the amount of $4,260.09. As we have found in our findings of fact, her total net income for the first three taxable years amounted to $5,240.05, $5,267.51 and $7,825.55, respectively, and her adjusted gross income for 1948 was $22,684.52. She, thus, understated her income for the four years in the respective amounts of $4,387.86, $3,076.69, $5,916.57 and $18,424.43. It is obvious that she did not report a large percentage of her return in each year. As stated by the Sixth Circuit Court of Appeals in Rogers v. Commissioner, 111 Fed. (2d) 987, affirming 38 B.T.A. 16: "* * * Discrepancies of 100% and more between the real net income and the reported income for three successive years strongly evidence an intent to defraud the Government. The Board did not err in deciding that 50% penalties should be assessed." Arlette Coat Co., supra, p. 756; Victor A. Dorsey, 33 B.T.A. 295, *28 Frank A. Weinstein, 33 B.T.A. 105. The repeated omission from the returns of such large percentages of the total taxable income, under circumstances indicating that petitioner, at the time the returns were made, knew that the omitted amounts constituted taxable income, cannot be ascribed to oversight or error but compels the conclusion that at least a part of the deficiency for each taxable year is due to fraud with intent to evade tax. Rogers v. Commissioner, supra.Her explanation that the returns reflect her income is evasive and unsatisfactory. Under our revenue laws the taxpayer is, in the first instance, his own assessor and, therefore, has the responsibility to deal fairly and honestly with his Government - he must turn square corners in reporting his income. Charles E. Mitchell, 32 B.T.A. 1093. Under the circumstances, and the record before us, we cannot conclude that petitioner has dealt fairly and honestly with the Government. Respondent has met his burden and his action in assessing the fraud penalties is sustained. Decision will be entered under Rule 50. Footnotes
1. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. ↩
2. SEC. 29.41-1. COMPUTATION OF NET INCOME. - Net income must be computed with respect to a fixed period. Usually that period is 12 months and is known as the taxable year. Items of income and of expenditure which as gross income and deductions are elements in the computation of net income need not be in the form of cash. It is sufficient that such times, if otherwise properly included in the computation, can be valued in terms of money. The time as of which any item of gross income or any deduction is to be accounted for must be determined in the light of the fundamental rule that the computation shall be made in such a manner as clearly reflects the taxpayer's income. If the method of accounting regularly employed by him in keeping his books clearly reflects his income, it is to be followed with respect to the time as of which items of gross income and deductions are to be accounted for. (See sections 29.42-1 to 29.42-3, inclusive.) If the taxpayer does not regularly employ a method of accounting which clearly reflects his income, the computation shall be made in such manner as in the opinion of the Commissioner clearly reflects it.↩
3. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612 (d) (2).↩