Anthony F. Crapitto and Lena Crapitto v. Commissioner.
Crapitto v. Commissioner
Docket No. 39502.
United States Tax Court
T.C. Memo 1955-77; 1955 Tax Ct. Memo LEXIS 264; 14 T.C.M. (CCH) 252; T.C.M. (RIA) 55077; March 31, 1955
*264 On their joint return for 1946, petitioners reported net income of $2,442.58. Respondent, utilizing the net worth plus nondeductible expenditures method, determined that petitioners understated their net income by $40,978.12 and that they were liable for a deficiency and fraud penalty. [1939 Code Sec. 41 - similar to 1954 Code Sec. 446(a) and (b)] Held: 1. Respondent's use of the net worth method was appropriate in this case but his computations were erroneous in the particulars noted. Petitioners understated net income for 1946 by $15,078.12. [1939 Code Sec. 293(b) - substantially unchanged in 1954 Code Sec. 6653(b)] 2. Petitioners' deficiency was due in part to fraud with intent to evade tax. Ben F. Foster, Esq., John E. Pledger, Sr., Esq., and John E. Pledger, Jr., Esq., for the petitioners. Edward *265 L. Compton, Jr., Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner determined a $20,065.68 deficiency in petitioners' income tax for 1946 and a $10,032.84 addition to tax for fraud. The deficiency was based on the addition to the $2,442.58 net income reported on petitioners' joint return of "Unreported income $40,978.12." The Commissioner explained this addition to petitioners' net income in the following manner: Increase in net worth during 1946
$36,001.82
Non-deductible expenditures
4,540.09
Partnership withdrawals
878.79
Total
$43,420.70
Amount reported
2,442.58
Adjustment
$40,978.12
Petitioners contend that the Commissioner erred in his deficiency determination, which was based on computation of their income pursuant to the so-called net worth plus nondeductible expenditures method, and in his determination of the fraud penalty. Findings of Fact Some of the facts were stipulated and the stipulation thereof is incorporated herein by reference. Anthony F. and Lena Crapitto are husband and wife and resided in Huston, Texas, during the calendar year 1946. They filed a joint income tax return *266 for that year with the collector of internal revenue for the first district of Texas. For convenience, Anthony F. Crapitto, who managed the affairs of the marital community, will sometimes hereinafter be referred to as Anthony, and Lena Crapitto will sometimes hereinafter be referred to as Lena. Anthony was 41 years old in 1946. He owned and ran Tyler's Drug Store until August 1 of that year when he sold it to his brother. Anthony personally kept the drugstore's books during his period of ownership but those books were neither shown to respondent's agents nor available at the hearing of this case. Anthony testified that these books had been lost after he sold out the business and that he had been unable to locate them although he had made a diligent search. During the first five months of 1946, Anthony attended law school three nights a week, including Monday night, from 7 to 10 o'clock. He graduated from law school and spent most of June and part of July in Austin, Texas, studying for and taking the bar examination, which he failed. In September he again left Houston for about three weeks and rented a cottage in which he studied for the October bar examination. Anthony was one *267 of the founders and a member of a social (noncollegiate) fraternity which held business meetings every Monday night. The business meetings lasted until about 11 o'clock and were followed by gambling sessions lasting until 2 a.m. The fraternity derived income from certain fees charged the gambling participants and used that income to erect a fraternity house in a later year. Anthony attended most of the Monday night gambling sessions in 1946, at which thousands of dollars changed hands, and participated heavily in the gambling. He sometimes obtained funds for the Monday night sessions in the following manner: On Monday afternoon he drew a check, payable to "Cash," on the Tyler's Drug Store account in the Harrisburg National Bank, Houston, and cashed that check in the City National Bank, Houston. Copies of two of those checks are in evidence in this proceeding. One is dated August 26, 1946 for $3,500 and the other is dated October 14, 1946 and is for $5,000. Both checks are signed "Tylers Drug Store A. F. Crapitto." On Tuesday following the cashing of the checks at the City National Bank, Anthony gave an officer of the Harrisburg National Bank the amount of cash necessary to cover *268 the check drawn the previous day. That cash was used to purchase a cashier's check. Thereafter, when Anthony's check arrived at the Harrisburg National Bank the cashier's check was substituted for it and it was marked "Paid" and mailed to Anthony without being reflected in the bank account of the drugstore. Anthony also gambled at at least one stag party held by the fraternity in 1946 and at numerous night clubs and bars in and around Houston. He went to New Orleans for Columbus Day, 1946, lost all his money gambling while there, and had Lena fly from Houston with an extra $2,500. Anthony kept no records of his gambling wins and losses; and it appears that, on occasion, he received checks drawn by others to "Cash" and negotiated those checks without first endorsing them. Petitioners received rental income in 1946 and kept books, which were available for inspection, recording that income. In addition, petitioners agreed that income from the estate of V. Lucia was constructively, though not actually, received by Lena in 1946. On their joint return filed for 1946, petitioners reported the following income: Net rents (after deducting, inter alia,
$3,030 for depreciation)
$1,011.32
Net profit - Tyler's Drug Store
982.47
Income from V. Lucia Estate
878.79
Adjusted gross income
$2,872.58
Less: charitable contribution
430.00
Net income
$2,442.58
*269 Respondent determined petitioners' deficiency pursuant to the following net worth plus nondeductible expenditures computation: [Net Worth]
Increase
Item
Dec. 31, 1945
Dec. 31, 1946
(Decrease)
1. Cash in banks
$19,118.40
$ 23,667.09
$ 4,548.69
2. Merchandise inventory
2,116.92
(2,116.92)
3. Fixtures (store)
1,000.00
(1,000.00)
4. United States bonds
956.25
956.25
5. Columbian Investment & Savings Com-
pany stock
1,719.95
2,020.00
300.05
6. Parmeson's, Inc., stock
15,000.00
15,000.00
7. Real estate
70,750.00
81,250.00
10,500.00
8. Reserve for depreciation
( 9,712.00)
(12,042.00)
(2,330.00)
9. Notes payable [to banks]
(15,000.00)
15,000.00
10. Mortgages payable
( 3,100.00)
( 5,000.00)
(1,900.00)
Totals
$67,849.52
$105,851.34
$38,001.82
Increase in net worth
$38,001.82
11. Nondeductible expenditures
4,540.09
Total increase in net worth and nondeductible expenditures
$42,541.91
12. Plus: Income from V. Lucia Estate, accrued but not received
878.79
Net income as corrected
$43,420.70
Less: Net income per return
2,442.58
Unreported net income
$40,978.12
*270 The record reveals that Items 1 through 12 of the above net worth statement are substantially correct in themselves. For completeness we mention the following regarding some of those items: (a) Item 2 represents inventory of Tyler's Drug Store and was derived from petitioners' return. (b) Item 3 represents fixtures of Tyler's Drug Store. A cash register on hand December 31, 1945 and valued at $800 is not reflected therein. Its omission creates no distortion, however, since it was on hand at the close of 1946 and being used by Parmeson's Inc., (see Item 6). (c) The $300.05 increase in petitioners' Columbian Investment & Savings Company stock (Item 5) resulted from an additional investment therein by Anthony. (d) Parmeson's, Inc., (Item 6) was a corporation formed on May 11, 1946, to operate a drive-in grocery store. The sole equal stockholders thereof were Anthony and V. L. Parmeson. (e) Anthony purchased certain acreage in 1946 for $10,500 (Item 7), paying $5,500 down and executed a $5,000 mortgage which was outstanding at the end of 1946 (Item 10). The $3,100 mortgage outstanding at the beginning of 1946 was on a piece of property purchased by Anthony in 1945 and was to be liquidated *271 at the rate of $60 per month. Anthony, however, paid the full $3,100 in cash around July 1946. (f) Allowable depreciation on petitioners' property in 1946 was $2,330, as reflected in Item 8. The excessive depreciation deduction of $3,030 reported in their joint return resulted from their erroneously taking two deductions of $700 each for the same piece of property. (g) The amount and the recipients of the expenditures in Item 11 were stipulated by the parties and all of those expenditures were nondeductible in nature. An undetermined amount of those expenditures was made on account of purchases by Lena's relatives but the evidence does not support petitioners' contention that they were reimbursed to any extent by those relatives. Respondent's computations are incorrect, however, in that they fail to reflect the following decreases in petitioners' net worth: (a) Anthony borrowed $10,500 from Louis Lampo and $9,400 from Nathan Perel in the fall of 1946. No portion of those loans was repaid during 1946. (Anthony also borrowed $8,500 from J. A. Wolfe in 1946 but repaid that loan before the close of 1946.) (b) At the beginning of 1946, Anthony had $22,000 in currency which he kept *272 on hand. He spent $6,000 of that sum during the tax year which reduced the balance remaining at December 31, 1946 to $16,000. Of the $6,000 spent, $5,000 constituted part of Anthony's investment in Parmeson's, Inc. The balance of his $15,000 investment in that company was composed of $10,000 in cash which he borrowed from Charles Aleo, Jr., but which he repaid prior to the close of 1946. (In addition to his $15,000 investment Anthony gave Parmeson's, Inc., the use of a cash register, valued at $800, from Tyler's Drug Store.) The aforementioned adjustments to respondent's computations may be summarized as follows: Net income per respondent's net worth statement
$43,420.70
Less: Debt owed Louis Lampo
$10,500.00
Debt owed Nathan Perel
9,400.00
Reduction in currency
6,000.00
25,900.00
Net income corrected
$17,520.70
Net income reported by petitioners
2,442.58
Unreported net income
$15,078.12
On March 14, 1947, Anthony borrowed $5,000 from the Harrisburg National Bank, stating to the bank that such loan was necessary to enable him to pay his 1946 income taxes. On that same day petitioners' return was prepared reporting net income of $2,442.58, *273 tax of $274.09, and claiming a tax overpayment of $113.91 by reason of the fact that $388 in estimated taxes for 1946 had already been paid. A part of the deficiency for the year 1946 is due to fraud with intent to evade tax. Opinion BLACK, Judge: There is no question in our mind that respondent's resort to socalled net worth plus nondeductible expenditures method to determine petitioners' correct net income is proper under the circumstances of this case. The unavailability of books or records of Tyler's Drug Store, which Anthony owned and operated, during part of 1946, and Anthony's failure to keep any records of his extensive gambling activities, [1] provide ample authority for respondent's resort to that method under section 41 of the Internal Revenue Code of 1939. Louis Halle, 7 T.C. 245, 250, affirmed (C.A. 2) 175 Fed. (2d) 500, certiorari denied 338 U.S. 949. Even had petitioners presented a superficially complete set of books the net worth method could be used as a test of the reliability of such books. Estate of George L. Cury, 23 T.C. 305; Estate of W. D. Bartlett, 22 T.C. 1228; Morris Lipsitz, 21 T.C. 917. *274 And, as we said in the Cury case, "where the employment of the net worth method reveals a substantial gap between reported income and the increase in net worth, the latter may be taken as a guide for determining the amount of income actually received." The correctness of respondent's computation of petitioners' net income pursuant to the net worth method depends upon the resolution of questions of fact and it is petitioners' burden to prove that respondent's computation is in error. *275 Our findings of fact detail the conclusions reached by us on those questions and it would serve little purpose to review and analyze those findings. However, we here comment on the more salient features thereof. Respondent determined that petitioners' net income for 1946 was $43,420.70 and that they failed to report $40,978.12 thereof. In making this determination, however, respondent failed to take into account (a) two loans, in the amounts of $10,500 and $9,400, obtained by Anthony in 1946 and outstanding at the end of that year, and (b) the fact that Anthony had cash on hand of $22,000 at the beginning of 1946 from which he expended a net of $6,000 during the year. Considering those decreases in net worth (totaling $25,900) we conclude that petitioners' actual net income was $17,520.70 and that they failed to report $15,078.12 thereof. Taxpayers in cases of this sort often contend that, at the beginning of the year involved, they had cash accumulations in their possession which they depleted during the year. It is seldom that such a story is supported by sufficient evidence to render it capable of belief. Here, however, we think that Anthony did have $22,000 in currency at *276 the beginning of 1946 and that he spent $6,000 thereof during the year. Anthony testified that in a subsequent year he took the balance of currency then remaining in his possession, which consisted of about $16,000 in mutilated bills, to a bank in order to exchange it for new currency. Testimony by an official of the bank involved corroborated this. This official was W. P. Wells, Jr., cashier of the Harrisburg National Bank, Houston, Texas. He testified, in part, as follows: "Q. Mr. Wells, do you recall during 1950, I believe, you correct me if I am wrong, when Mr. Crapitto brought in a substantial amount of currency into the bank in a mutilated or, well, mutilated condition? A. Yes, sir. * * *
Q. Did you handle that transaction or a part of that transaction? A. Yes, sir. Q. Describe to the Court as nearly as you can so that we can get the picture of what condition that currency was in at that time. A. Well, the currency was - it was impossible to determine the denominations - I mean the full bill - some bills you might be able to determine half of it and then the other half would be completely gone, but it was very mutilated. * * *
Q. In what kind of container *277 was it brought to you in? A. Paper sack. * * *
Q. Well, now, what if anything did you do with that money at that time? A. It wasn't possible to do anything with it so I sent it into the Federal Reserve Bank to determine how much was there, if possible. * * *
A. We sent the money, as I remember, to the Federal Reserve, the local Federal Reserve Bank in Houston, and they couldn't determine how much money was there, so they forwarded it to Washington, as I remember. It was somewhere between sixty and ninety days before they credited our account with the proceeds of the money. And I gave the money to Mr. Crapitto. * * *
Q. Do you have any recollection as to whether it was more or less than $10,000? A. It was more than $10,000. Q. And there is a record, of course, in the bank as to the amount of it? A. Yes, sir, as I recoilect, it was somewhere around sixteen or seventeen thousand dollars. I couldn't be positive." The foregoing is the substance of Mr. Wells' testimony concerning Anthony's mutilated currency which was redeemed in 1950 through the Federal Reserve Bank and a large part of which we are convinced from the testimony Anthony had on hand in 1946. *278 The amount and mutilated condition of that redeemed currency are important factors consistent with petitioners' contention regarding the existence and depletion of the cash fund in 1946 and, taken with the other evidence of record, convinces us that a $6,000 reduction on account thereof must be reflected in petitioners' net worth for 1946. Petitioners contend that respondent's computation of their 1946 increase in net worth must be further reduced to reflect (a) $8,500 borrowed from J. A. Wolfe and $10,000 borrowed from Charles Aleo, Jr., (the latter invested in Parmeson's, Inc., stock); (b) about $1,000 in merchandise and fixtures from Tyler's Drug Store which constituted part of the $15,000 investment in Parmeson's, Inc., stock; and (c) $2,000 to $3,000 in gifts from Anthony's father. These contentions cannot be sustained. The evidence establishes that Anthony repaid the aforementioned $8,500 and $10,000 loans prior to the close of 1946; consequently, they did not constitute outstanding liabilities which decreased petitioners' net worth as of the end of that year. Further, we have found that Anthony's $15,000 investment in Parmeson's, Inc., stock was composed of the $10,000 borrowed *279 from (and repaid to) Charles Aleo, Jr., plus $5,000 from the $22,000 cash fund on hand at the beginning of 1946. Anthony did contribute the use of an $800 cash register (on hand at the opening of 1946) to Parmeson's, Inc., but that was in addition to the $15,000 investment therein and reflects no change in his net worth during the year. And, as regards the Tyler's Drug Store inventory allegedly contributed to Parmeson's, Inc., it is noted that respondent's net worth statement itself shows complete liquidation of such inventory during 1946 and thereby gives petitioners the full benefit of a decrease in net worth as a result thereof. Finally, the only evidence concerning the alleged gifts received from Anthony's father in 1946 was Anthony's testimony. We observed Anthony carefully while he was on the stand and found such testimony to be indefinite, vague and unconvincing. See Arlette Coat Co., 14 T.C. 751. Petitioners have failed to convince us that any such gifts were received during 1946. We next consider whether petitioners' deficiency was due, at least in part, to fraud with intent to evade tax. The burden of proving fraud rests upon respondent and the evidence necessary *280 to discharge that burden must be clear and convincing. Snell Isle, Inc. v. Commissioner, (C.A. 5) 90 Fed. (2d) 481, certiorari denied 302 U.S. 734; Wiseley v. Commissioner, (C.A. 6) 185 Fed. (2d) 263. Rarely is it possible, however, to adduce direct evidence of fraud. We recognized this in Wallace H. Petit, 10 T.C. 1253, wherein we said at page 1257: "* * * Because direct and clear-cut proof of fraud is seldom available, it must be established by a full consideration of the records and testimony offered, the appearance and manner of the witnesses, conduct of the taxpayer, and the conditions and circumstances surrounding the transactions which produced the disputed income." Anthony, who managed the affairs of the marital community of himself and Lena, graduated from law school during the tax year in issue. Although he took no course in Federal income taxation while in law school we think his legal training, plus his general intelligence, must have made him aware of the general requirements of the revenue laws and his responsibility thereunter. Therefore, it is not conceivable that petitioners' deficiency resulted from ignorance. *281 The only possible explanation therefor is either negligence or fraud. We are convinced after a consideration of all the facts and circumstances of record, chief among which are stated below, that the deficiency was due at least in part to fraud. Petitioners reported less than one-seventh ($2,442.58) of their actual net income ($17,520.70) for 1946. Such gross understatement in itself raises a strong inference of intent to defraud. Victor A. Dorsey, 33 B.T.A. 295 [Dec. 9109]; Rogers v. Commissioner, (C.A. 6) 111 Fed. (2d) 987; Estate of Joseph Nitto, 13 T.C. 858. Moreover, not only did Anthony fail to keep any records of his extensive gambling activities but he took steps the effect of which was to conceal the magnitude of those activities. For example, he obtained funds for weekly Monday night gambling sessions by cashing checks drawn on his Tyler's Drug Store account in the Harrisburg National Bank, but arranged with that bank to substitute cashier's checks (which he purchased for cash) for the checks he had drawn so that the latter would not show as withdrawals on the drugstore's account. The fact that he drew the aforementioned checks *282 on Monday and always had the cash to purchase the cashier's checks covering them on the following day would seem to indicate that his gambling endeavors were not unsuccessful. In addition, it appears that Anthony occasionally negotiated checks drawn, by others, payable to "Cash" without endorsing them. Fraud is certainly inferrable from Anthony's aforementioned actions since they constitute, in the words of the Supreme Court in Spies v. United States, 317 U.S. 492, the "handling of one's affairs to avoid making the records usual in transactions of the kind, and * * * conduct, the likely effect of which would be to mislead or conceal." Anthony testified that his only reason for not wishing the checks drawn on the drugstore account in the Harrisburg National Bank to appear as withdrawals on the records of that account was to prevent Lena from learning of the magnitude of his gambling activities. However, we note (a) that the bank, after substituting the cashier's checks for those drawn by Anthony, mailed the latter to him which, we think, would not have been the arrangement had Anthony wished to avoid all possibility of Lena's learning of those checks; (b) Anthony did *283 not hesitate in having Lena fly to New Orleans around Columbus Day with $2,500 in cash after he lost all his money gambling; and (c) Lena appears to have realized that Anthony had a source of income in addition to those reported on their joint return for 1946 since, although net income of only $2,442.58 was reported therein, Lena and her relatives spent $4,540.09 on items of a personal, nondeductible nature. In view of these circumstances we are not persuaded by Anthony's testimony regarding the motivation for his arrangement with the bank. Cf. Carmack v. Commissioner, (C.A. 5) 183 Fed. (2d) 1, certiorari denied 340 U.S. 875. Another factor which we think has some significance is that on March 14, 1947, Anthony borrowed $5,000 from the Harrisburg National Bank stating that he needed money to pay his 1946 income taxes.that statement was not true since, on the same day, petitioners' joint return was prepared in which an overpayment of $113.91 was claimed. We think that this sort of conduct indicates a general lack of candor in his financial dealings and points to a lack of truth and veracity in such dealings. The circumstances detailed above, taken together *284 with Anthony's frequent vague and noncommittal manner on the witness stand, Arlette Coat Co., supra, Harry Feldman, 34 B.T.A. 517, establish a pattern which convinces us that the deficiency in issue resulted in part at least from fraud. It may well be that not all the deficiency is due to fraud but the fact that part of it is, makes the fraud penalty applicable to the entire deficiency. It is true that the record contains testimony regarding Anthony's good reputation in the community but the circumstances mentioned above outweigh the effect of that testimony. Decision will be entered under Rule 50. Footnotes
1. Petitioners contend that Anthony kept a fund on his person at all times, segregated from his other cash, which fund totaled $5,000 at the beginning of 1946 and which he used exclusively for gambling; that he never replentished that fund during 1946; and that the balance remaining in the fund at the end of the year indicated that he lost about $500 in gambling during the year. Those contentions are not sustainable, however, in view of our findings that Anthony obtained funds for his Monday night gambling sessions by cashing checks drawn on the Harrisburg National Bank and that Anthony lost all his money gambling in New Orleans around Columbus Day and had Lena fly there with an extra $2,500 for him.↩