VICTOR A. DORSEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59802. Promulgated October 25, 1935.

*Harry E. Kelly, Esq.*, for the petitioner.
*J. E. Marshall, Esq.*, for the respondent.

OPINION.

ARUNDELL: The respondent has determined a deficiency in income tax for the year 1928 in the amount of $22,159.50, and has asserted a 50 percent penalty of $11,079.75. The major part of the deficiency results from the respondent's treating as ordinary income a sum reported by petitioner as capital gain. Whether that income was ordinary income or capital gain, and whether or not petitioner is subject to a penalty are the two issues presented.

The petitioner, a resident of Chicago, Illinois, is a consulting engineer, specializing in public utility investigations and reports. In 1925 he was employed by a bank to examine the properties of the New York Oil Co., a corporation with its principal place of business at Casper, Wyoming. While engaged on that work petitioner came in contact with Minal E. Young, vice president and general manager of the New York Oil Co. and one of two executors of the estate of Frank G. Curtis, deceased.

The New York Oil Co. had an authorized capital of 400,000 shares of stock and had outstanding 384,023 shares, of which the Curtis estate owned 150,000 shares and Young owned 1,600 shares. The Curtis will gave the executors power to sell the property of the estate. The petitioner learned from Young that his stock and the stock owned by the estate was for sale.

Petitioner did not have the funds to purchase the stock of the New York Oil Co., but endeavored to secure other purchasers. On August 28, 1926, petitioner wrote to Young saying that he thought he had " made a deal." The letter read in part: " I can sell the company outright or sell control in which [event] the buyers want 240,000 shares. Can you get that amount. * * * Now Minal what is the minimum price for the estate stock and for what average price can you get the additional 90,000 shares." The letter refers to another individual who was apparently interested in the stock and continues: " * * * the lower he bids the more reasonable we can buy the estate stock and also the additional 90,000 shares." The " deal " referred to in the letter evidently did not materialize. About September 1926, or later, petitioner became acquainted with Paul W. Reize and informed him that the New York Oil Co. stock was for sale and interested Reize in attempting to secure purchasers. In 1927 Reize made contact with several corporations which were interested in the properties of the New York Oil Co., and on December 21, 1927, Reize and several corporations entered into a so-called " Stockholders Deposit Agreement." The substance of the agreement was that a holding company organized by Reize, the Utilities Purchasing Corporation, would purchase the stock of the New York Oil Co. deposited under the agreement and would transfer the assets of the New York Oil Co. to four corporations named in the agreement. It was stated in the deposit agreement that Reize had for some time past been carrying on negotiations looking to the acquisition of the stock and the sale of the New York Oil Co.'s assets, and that if the transactions were consummated Reize would receive compensation for his services from the four corporations that were to acquire New York Oil Co.'s assets. Minal E. Young and D. A. Curtis were parties to this agreement as a " Committee ", in which capacity they made certain representations concerning the stock and assets of the New York Oil Co. The petitioner's name does not appear in the agreement and he was not a party thereto.

Upon deposit of 335,902 shares of New York Oil Co. stock the transactions outlined in the deposit agreement were consummated in April 1928. The New York Oil Co. stockholders received $5,280,-379.44. Thereafter in 1928 Reize paid to the petitioner $177,404.49 in cash and delivered to petitioner bonds of the Empire State Oil

Co. (one of the purchasers of New York Oil Co.'s assets) in the face amount of $54,000, but which had an actual value not in excess of $5,400. Reize represented to petitioner that the amount so paid to petitioner was one half of the compensation that Reize had received on consummation of the deal.

In 1929 petitioner secured at least two extensions of time within which to file his income tax return for the year 1928. Petitioner consulted his attorney with respect to the preparation of his 1928 return, and as the petitioner had had a number of transactions in securities the attorney advised the petitioner that he should have an audit made by a competent accountant. Petitioner thereupon engaged a certified public accountant to make an audit and to aid in the preparation of his return. The accountant consulted the attorney on various matters in connection with petitioner's 1928 income. When they reached the matter of reporting the income from the New York Oil Co. deal the accountant and the attorney conferred with Reize and secured from him certain figures in connection with the transaction. During the course of such conference it developed that Reize had reported or proposed to report his income from the New York Oil Co. transaction as ordinary income. Petitioner's accountant and attorney stated to Reize that in their opinion petitioner's share of the income from that transaction was capital gain, and they suggested to Reize that he report his income from the transaction in the same manner. Reize stated that he did not agree with them, that in his opinion there had been no ownership of property, and that the facts in the case did not justify reporting either his income or Dorsey's as capital gain. He refused to make his return in the manner proposed by the accountant and the attorney.

Petitioner's return was actually prepared by the accountant he had engaged and in schedule D thereof the income from the New York Oil Co. transaction was reported as follows:

SCHEDULE D.—CAPITAL NET GAIN OR LOSS FROM SALE OF ASSETS HELD MORE THAN TWO YEARS

| 1. Kind of property | 2. Date acquired | 3. Date sold | 4. Amount received | 6. Cost | 9. Net gain or loss |
|---|---|---|---|---|---|
| 335,902 shares New York Oil Co. | June 1925 | May 1928 | 1 $5,463,183.93 | 1 $5,280,379.44 | $182,804.49 |

1 See Deposit Agreement Dec. 21, 1927.

The deposit agreement was not attached to the return.

The return was sworn to by petitioner on July 15, 1929, and filed with the collector at Chicago on or about that date.

The respondent has determined that the income of $182,804.49 arising from the New York Oil Co. transaction was ordinary net income

and has accordingly asserted a deficiency in income tax. Respondent has also determined that the deficiency is due to fraud with intent to evade tax and has asserted a 50 percent penalty.

Petitioner reported his income from the New York Oil Co. transaction as a capital gain and he contends that that was correct. He concedes that he did not have and did not sell the New York Oil Co. stock. His position is that he had the exclusive right to purchase the stock of the company; that such right was granted to him by Young in 1925; that he continued to hold that right until 1928, when the stock was acquired by the Utilities Purchasing Corporation; and that the right constituted " property."

Petitioner's contentions are wholly without merit. At no time did he own the stock that was sold in 1928 or any interest in the stock that can be regarded as a property right. His reporting the transaction as a sale of stock was clearly wrong. In fact, every statement in schedule D of the return, except the amount of gain realized, is false. The petitioner did not acquire 335,902 shares of stock, or any other amount, in June 1925; he did not sell that amount of stock, or any other amount, in May 1928; he did not receive $5,463,183.93; there was no cost to him of $5,280,379.44 or any other sum; the deposit agreement does not explain petitioner's participation in the transaction, or show the source of his income.

The amount that petitioner received was in the nature of a commission for his part in discovering the deal and in assisting Reize in consummating it. There is no indication that the petitoner was ever in doubt as to the source and character of the sum he received, and if he had been it must have been dispelled by Reize when the petitioner's return was being prepared. Throughout the record appear the terms " option " and " property right " in reference to the petitioner's arrangement with Young concerning the stock. Neither term describes the facts. Young's testimony describing the situation is: " We had an oral understanding that he could buy the stock at any time he produced the money for it." There was no time limit on this arrangement, and it appears that Young did not consider that he had granted any exclusive right to the petitioner, for his testimony is that others were interested in the stock and he notified petitioner that " if he wanted to take the stock he better get busy." There does not appear to have been any price agreed upon for the stock. While Young testified that he indicated a price to the petitioner, in an affidavit made by him in 1929, and placed in evidence, he stated the price was to be fixed after appraisals and investigations had been made by the petitioner. It appears from petitioner's letter to Young in August 1926 that no price had been agreed upon between them. The agreement, whatever it was, obviously related to only a

portion of the 335,902 shares that were transferred in 1928. Young himself had only 1,600 shares. The Curtis estate had 150,000 shares and undoubtedly Young would need the consent of his coexecutor to sell that stock. Assuming that he had such consent or that he alone could sell the estate stock, the total of the estate stock and his stock is less than one half the stock sold and is insufficient to give control of the company. This situation was known to the petitioner, as shown by his letter to Young in August 1926, in which he inquired whether Young could get the additional stock necessary to give control. As far as the record shows there was no consideration for the agreement. Thus the agreement was simply that if the petitioner produced some money he could buy an unascertained portion of the New York Oil Co. stock for an unascertained price. Clearly he had no enforceable right which can be dignified by the term option or property right. "An option, as used in the law of sales, is a continuing offer or contract by which the owner stipulates with another that the latter shall have the right to buy the property at a fixed price within a certain time, or on compliance with certain terms and conditions; or which gives to the owner of the property the right to sell or demand sale." "An option contract, to buy or sell, as in the case of other contracts, must be supported by a valuable consideration." 55 C. J. §§ 68, 69. Petitioner's connection with the New York Oil Co. deal was not that of an owner of any rights or property, but solely that of an intermediary who aided in bringing together the parties who purchased and sold the stock. Consequently his income from the transaction was a commission and clearly not derived from any property and the respondent correctly treated it as ordinary income.

The evidence supports the respondent's assertion of fraud with intent to evade tax. The petitioner knew that he had not bought or sold the stock of the New York Oil Co.; he knew that he had no cost or receipts in the amounts represented; he knew that he was not a party to the deposit agreement. He testified that he read the return before signing and swearing to it. It is beyond belief that such gross misstatements of fact could be made innocently, particularly where the facts were carefully inquired into by not only the petitioner, but also his attorney and accountant. The accountant's explanation, in part, is that by including in the schedule the footnote " See deposit agreement 12/21/27 " the Government would be put on notice, and that in a subsequent investigation by Government agents " we would present the working papers, and have the facts, and all the disclosures would be made * * *." The deposit agreement certainly would not serve to put the Government on notice as to the source and character of petitioner's income. As pointed out above, the petitioner was not a party to the agreement,

his name does not appear therein, and he received no income under it. Had there been an honest intent to apprise the Government of the facts it would have been manifested in some way other than gross misstatements of the basic facts and figures. Instead of describing in any way approaching accuracy the source of his income, the petitioner went out of his way to report false facts and figures.

Upon consideration of all the evidence we are convinced that petitioner's falsely reporting his income as capital gain was deliberate and fraudulent with intent to evade tax. We find as a fact that part of the deficiency is due to fraud with intent to evade tax. The respondent's assertion of the fraud penalty is sustained.

Reviewed by the Board.

*Decision will be entered for the respondent.*