MILTON H. L. SCHWARTZ, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Schwartz v. Commissioner
Docket Nos. 6214-70, 6222-70, 6232-70.
United States Tax Court
T.C. Memo 1974-245; 1974 Tax Ct. Memo LEXIS 75; 33 T.C.M. (CCH) 1085; T.C.M. (RIA) 74245; September 19, 1974, Filed. *75 For the years 1949 and 1952 through 1956, petitioner-husband consistently underreported taxable income, repeatedly treated compensatory payments as capital transactions, omitted specific items of income, and improperly reported certain transactions on the Federal income tax returns for those years. Held, the underpayments in Federal income taxes for those years were, at least in part, due to fraud on the part of the petitioner-husband. Held, further, the respondent's reconstruction of income based on the bank deposits method, inclusion of gambling winnings and compensation in taxable income, disallowance of loss on the sale of property and certain business expenses, and other adjustments - sustained. Held, further, as petitioner-wife had no independent income in 1949 and 1954, she was not required to file declarations of estimated tax and is not liable for penalties for her failure to so file. Sec. 294(d) (1) (A), I.R.C. 1939. Milton H. L. Schwartz, pro se in docket Nos. 6214-70 and 6232-70. Morris H. Goldman, Ronald M. Wiener, and Dennis L. Cohen, for the petitioner in docket No. 6222-70. Alan E. Cobb, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, *76 Judge: The respondent determined the following deficiencies in, overassessment in, and additions to, the petitioners' Federal income taxes: Additions Petitioner
Year
Deficiency
Sec.6653(b) [2]
Sec. 294(d) (1) (A) [4]
Over-assessment Posey Schwartz and Milton H. L. Schwartz
1949
$13,852.16
$ 7,193.78 [3]
$1,353.10
1954
5,226.06
2,981.72 [3]
573.16
$144.40
1955
10,572.10
5,286.05
1956
15,659.35
7,829.68
Milton H. L. Schwartz
1952
34,200.98
17,100.49 [3]
3,411.73
1953
6,035.62
3,017.81 [3]
586.36
The main issue to be decided is whether, for the years 1949 and 1952 through 1956, underpayments of Federal income taxes were due to fraud on the part of Milton H. L. Schwartz. If so, the amount of deficiencies in Federal income taxes due for those years must be determined. It must also be decided whether the petitioners are liable for penalties *77 for failure to file declarations of estimated tax and whether they are liable for a penalty for the late filing of their 1954 Federal income tax return. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioner, Milton H. L. Schwartz, resided in New York, New York, at the time of filing his petitions herein. The petitioner, Posey Schwartz, resided in Philadelphia, Pennsylvania, at the time of filing her petition herein. Milton and Posey Schwartz were husband and wife during the years 1949 through 1956. They filed joint Federal income tax returns, on the cash method of accounting, for the years 1949 and 1954 through 1956. Milton Schwartz filed separate individual Federal income tax returns, on the cash method of accounting, for the years 1952 and 1953. All such returns were filed with the district director of internal revenue, Philadelphia, Pennsylvania. During the years 1949 and 1952 through 1956, Milton Schwartz was a licensed attorney practicing law in Philadelphia, Pennsylvania. His practice generally consisted of reorganizing and obtaining financing for business enterprises. He also worked in the area of international financing *78 transactions. In 1949, Mr. Schwartz was enrolled to practice before the Treasury Department. On one occasion, he represented clients before the Internal Revenue Service. During the late 1940's or early 1950's, Mr. Schwartz took two tax courses from the Practicing Law Institute of New York. Throughout the years 1949 and 1954 through 1956, Mrs. Schwartz had no independent source of income. On August 10, 1948, Mrs. Schwartz acquired property located on Devereaux Street in Philadelphia, Pennsylvania, for $7,500, and on April 11, 1949, she acquired another parcel located nearby for $28,000. (Together, such properties are referred to as the Frankford properties.) For his own purposes, Mr. Schwartz arranged for the acquisition of the properties, placed title to them in Mrs. Schwartz" name, and arranged for their subsequent transfer. Mrs. Schwartz was a mere nominal owner for Mr. Schwartz with respect to the properties. They transferred the properties to Helene Nathanson on November 3, 1949. The instruments of conveyance stated that the transfers were without consideration and that the grantee was a straw party in the transactions. On July 7, 1950, Miss Nathanson transferred the *79 properties to Evelyn Patterson for a total consideration of $33,500.00. At settlement on that same date, Mr. and Mrs. Schwartz received $6,131.99 of the proceeds. Paul Steiner, the mortgagee, received $23,000.00. Helene Nathanson was paid $30.75. Nine hundred thirty-seven dollars and forty-three cents was disbursed for real estate taxes and revenue stamps. On their joint Federal income tax return for the year 1949, Mr. and Mrs. Schwartz reported a capital loss of $12,000.00 from the sale of the Frankford properties. However, any loss from the sale of such properties occurred in 1950. In May 1946, Mrs. Schwartz acquired a one-third interest in a building located at 13th & Arch Streets (St. George building), Philadelphia, Pennsylvania. Her basis in the building was $3,536.78. Her interest was sold on January 3, 1949, for $28,000.00.The capital gain from the sale was $24,463.22. On their 1949 joint Federal income tax return, Mr. and Mrs. Schwartz reported a capital gain of $24,217.34 from the sale of the building. Mrs. Schwartz paid nothing for her interest in the building; Mr. Schwartz provided the funds to purchase her interest. When her interest was sold, Mr. Schwartz received *80 the proceeds, and she received none. As part of the same transaction, Mrs. Schwartz was paid $3,000 for her interest in assets other than the real estate. Mr. Schwartz was the actual recipient of the proceeds from the sale of her interest.Mr. Schwartz purchased the property on her behalf and never intended her to have any beneficial control over it. Mrs. Schwartz never exercised any control over the property or made any decisions with respect to it; she was a mere nominee for Mr. Schwartz with respect to the property. During 1949, Mr. Schwartz received $30,000 of gambling income, which was not reported on his and Mrs. Schwartz" return for that year. Mr. and Mrs. Schwartz reported a net loss of $1,188.65 on their joint 1949 Federal income tax return. However, for that year, Mr. and Mrs. Schwartz had taxable income of $40,848.14, and in their 1949 return, their taxable income was understated by such amount. In January or February 1952, Alfred L. Laupheimer and Paul Steiner, sole shareholders of American and Foreign Warehouse Co., Inc. (American), retained Mr. Schwartz to act as attorney for American. He was engaged particularly to handle American's impending bankruptcy. American *81 managed Cramp Shipyard (Cramp), located in Philadelphia, Pennsylvania, under a lease with the Department of the Navy (Navy). On February 4, 1952, American was placed in involuntary bankruptcy, and on March 12, 1952, the lease with the Navy was terminated by order of the Federal district court which had jurisdiction over the bankruptcy proceedings. Subsequently, Mr. Laupheimer entered into a new agreement with the Navy whereby he agreed to lease the properties of Cramp. In making the agreement, he was acting as trustee for American's successor, General Public Warehouse Co., Inc. (General). On April 18, 1952, Mr. Schwartz, Mr. Laupheimer, and Maurice R. Massey, Jr., entered into an agreement whereby they agreed to go into business together under the name of General. Each of them agreed to subscribe to $10,000 of General's capital stock and to pay such amount on or before April 21, 1952. Mr. Schwartz never made the capital investment required by the agreement. During the period February to August 1952, Mr. Schwartz performed substantial services on behalf of General. He was mainly in charge of its financial affairs. On October 7, 1952, Mr. Schwartz, Mr. Laupheimer, and Mr. Massey *82 entered into a second agreement concerning their participation in General; the new agreement voided the April 1952 agreement and provided for certain payments to be made to Mr. Schwartz as compensation for the services he had rendered in connection with the leasing of Cramp. In the event the Navy entered into a lease with General, he was to receive a $7,000 lump-sum payment, a $3,500 promissory note due March 15, 1953, and $100 a week for the duration of the lease, or 5 years, whichever was the shorter period, commencing with the execution of the lease. A lease with the Navy was ultimately obtained in 1952, to begin in 1953. In 1954, in connection with the lease, the Navy commenced an audit of General's income and disbursements for the period March 17, 1952, to March 14, 1953. The counsel for General at that time was requested to obtain statements in support of General's disbursements. Accordingly, in 1956, he interviewed Mr. Schwartz regarding payments Mr. Schwartz had received from General in 1952; they also discussed the services Mr. Schwartz had performed for General. Based on the interview, the counsel prepared an affidavit for Mr. Schwartz; included in the affidavit was *83 a statement that Mr. Schwartz had received $12,500 from General as compensation. Mr. Schwartz particularly noted this statement and, as he was satisfied with the accuracy of the affidavit, executed it on May 28, 1956. During the years 1952 through 1956, General made the following payments to Mr. Schwartz, or persons on his behalf, as compensation for services performed by him: Year
Amount 1952
$12,500.00
1953
4,000.00
1954
5,300.00
1955
5,200.00
1956
10,704.45 Mr. Schwartz did not report these payments as professional receipts on any of his Federal income tax returns for the years 1952 through 1956. Instead, he reported the payments on his return for the year 1953, treating them as capital gains from a sale of an interest in General. He reported having a basis of $10,000 for such interest, having received $44,000 for its sale, and realizing a gain of $34,000. However, he also reported a capital loss of $174,800 as a result of a race track venture, and consequently, paid no tax on the reported gain from the sale of the interest in General. Paul Steiner was engaged in the construction business under the name of Paul Steiner & Co. during the years 1954 through 1956. During those years, *84 he had occasion to use Mr. Schwartz" professional services. On May 1, 1954, Mr. Schwartz requested payment from Mr. Steiner for services performed, and later that month, Mr. Steiner paid Mr. Schwartz $10,000 by check. Mr. Schwartz gave Mr. Steiner a receipt for $10,000, dated May 21, 1954, which stated that the payment was for services he had rendered during the period June 1, 1953, to May 3, 1954. Approximately 3 weeks later, Mr. Schwartz and Mr. Steiner went to New York where they met with persons interested in various development activities in Venezuela. At that time, Mr. Schwartz turned over the proceeds of the $10,000 check for investment in such developments; before then, he had sole control over the check. Mr. Schwartz initiated the meeting; Mr. Steiner did not participate in the venture until after the meeting took place. Mr. Steiner was to provide funds and management for the enterprise, although he and Mr. Schwartz had agreed that their relationship was to be a partnership. The association with the other Venezuelan investors was of a short duration since it quickly resulted in a financial loss for Mr. Steiner. Mr. Schwartz did not report the $10,000 payment on the *85 1954 Federal income tax return. On August 15, 1955, Mr. Steiner paid Mr. Schwartz $5,000, and the next day, Mr. Schwartz gave Mr. Steiner a receipt for the payment for services he had rendered and commissions. On the 1955 return, Mr. Schwartz reported only $1,000 of the $5,000 he received from Mr. Steiner during the year. In 1955, Mr. Schwartz and Robert M. Wolf, a real estate broker, participated in the acquisition of the Fretz building by the I.J. Knight Realty Corporation (Knight). On December 15, 1955, Maurice Shorenstein, the president of Knight, drew a check for $15,000 to the order of Mr. Wolf. The check was payment for a broker's commission earned by Mr. Schwartz and Mr. Wolf on the acquisition of the Fretz building by Knight. Mr. Wolf and Mr. Schwartz had agreed to split the commission equally, and consequently, Mr. Schwartz was entitled to $7,500 of the proceeds of the check. After receipt of the check, Mr. Schwartz and Mr. Wolf endorsed it to Knight as part payment for a stock interest in Knight. As a result, Mr. Schwartz obtained a 10-percent stock interest in Knight. Mr. Wolf and Mr. Schwartz invested in Knight upon the request of other investors in the company, *86 including Mr. Shorenstein. There had been allegations of misrepresentations on the part of the sellers of the Fretz building, and the other investors wanted the additional security resulting from an investment in the acquisition by Mr. Schwartz and Mr. Wolf. Had they not invested in Knight, the sale of the Fretz building would not have been consummated. On the 1955 Federal income tax return, Mr. Schwartz reported no commission from Knight. In August 1956, he sold his stock interest in Knight for $9,000. In the 1956 return, he reported a capital gain of $8,250 on the sale, using a basis of $1,750 and a sales price of $10,000. Mr. Schwartz was general counsel for Herman Greenfeld, who owned rights to old movies. Mr. Greenfeld sold his rights in the movies to Masterpiece Productions, Inc. (Masterpiece). United Artists Corporation (United) ran these movies on late-night television. As a result, Masterpiece instituted suit against United, contending that its rights to the movies included the rights to show them on television, and that it was thus entitled to royalties from United. Mr. Schwartz was in charge of the litigation and retained Lemuel Schofield, who also acted as Masterpiece's *87 attorney in the litigation. Masterpiece agreed to pay Mr. Schofield 50 percent of any amount recovered from United as compensation for his services in the suit, and Mr. Schwartz was to be compensated out of that payment. The suit was eventually dismissed, and nothing was paid to Mr. Schofield for his work on the suit. On November 13, 1953, Mr. Schofield assigned whatever interest he might have in a fee from Masterpiece to Mr. Schwartz. Subsequently, Mr. Schwartz brought an action against Masterpiece to recover on his own behalf whatever amount was due Mr. Schofield. The action was settled by a stipulation whereby Masterpiece agreed to pay Mr. Schwartz $5,000. During 1955, Mr. Schwartz received from his attorney $3,687.50 as his share of the settlement. Mr. Schwartz did not report such payment as professional receipts on the 1955 Federal income tax return. Instead, he reported the payment as proceeds received from the sale of an interest in Masterpiece in 1955. He reported a net gain of $3,000, using a sales price of $3,500 and a basis of $500. Mr. Schwartz never owned any stock in Masterpiece, nor any interest in its movies. Mr. and Mrs. Schwartz had the following unexplained *88 bank deposits for the years 1952, 1953, 1955, and 1956: Year
Amount 1952
$49,157.48
1953
13,506.37
1955
6,825.87
1956
23,865.98
In the course of his professional and investment activities, Mr. Schwartz made many trips, including some to foreign countries such as Cuba and Venezuela. He incurred substantial expenses on these journeys, for some of which he was not reimbursed by the parties on whose behalf he was acting. Occasionally, Mr. Schwartz entertained prospective business associates. Over the years, Mr. Schwartz borrowed extensively from various sources, including banks, finance companies, and friends. In transactions where interest was charged, he paid such charges. For the year 1952, Mr. Schwartz understated his taxable income as follows: Taxable income per return
$ (96.42)
Unreported income
48,874.87
Unallowable business deductions
2,755.50
Unallowable itemized deductions 4,829.66
Taxable income
$56,363.61
Understated taxable income
$56,363.61
For the year 1953, Mr. Schwartz understated his taxable income as follows: Taxable income per return
$ (120.49)
Unreported income
14,431.80
Unallowable business deductions
700.00
Unallowable itemized deductions 880.86
Taxable income
$15,892.17
Understated taxable income
$15,892.17
For *89 the years 1954, 1955, and 1956, Mr. and Mrs. Schwartz understated their taxable income as follows: 1954
1955
1956 Taxable income per return
$ 3,686.94
$ 1,905.75
$ 2,402.33
Unreported income
12,601.92
26,338.99
34,339.60
Unallowable business deductions
5,350.00
4,750.00
4,275.00
Unallowable itemized deductions
625.00
Rental expenses
(150.00)
Standard deduction
(190.34)
(388.25)
Unreported dividends from Knight 750.61
Taxable income
$21,298.52
$32,606.49
$42,392.54
Understated taxable income
$17,611.58
$30,700.74
$39,990.21 During the course of the IRS investigation of Mr. and Mrs During the course of the IRS investigation of Mr. and Mrs. Schwartz" various income tax returns, a special agent, Dominic Catrambone, made repeated requests to Mr. Schwartz to be allowed to see Mr. Schwartz" financial records. On June 12, 1957, Mr. Catrambone interviewed Mr. Schwartz and under oath, Mr. Schwartz stated that his records were "fairly complete and accurate." On that occasion, Mr. Schwartz did not answer a number of questions posed by Mr. Catrambone on the ground that he wished to refer to his records or that information requested was contained in records possessed by the IRS. During the interview, Mr. Catrambone asked *90 Mr. Schwartz if he could check Mr. Schwartz" records. In response, Mr. Schwartz said that Mr. Catrambone could look at the records any time after September. On September 16, 1957, Mr. Catrambone wrote to Mr. Schwartz confirming arrangements for an inspection on October 4, 1957. On September 30, 1957, Mr. Schwartz replied that the records had been warehoused and that he had not yet had a chance to sort out the records Mr. Catrambone wished to see. He also stated that when he did complete the necessary arrangements, he would set up an appointment with Mr. Catrambone. Mr. Catrambone wrote to Mr. Schwartz on October 16, 1957, agreeing to a delay in order to allow Mr. Schwartz the opportunity to procure the records and setting up an appointment for October 30, 1957. On October 25, 1957, at the request of Mr. Schwartz, the inspection was postponed to November 15, 1957; to that postponement, Mr. Catrambone agreed on November 5, 1957. On January 14, 1958, at Mr. Schwartz" instigation, another interview was postponed, and it was suggested that a date in the early part of February be arranged. On March 20, 1958, Mr. Schwartz confirmed an interview to take place on April 4, 1958. An *91 interview, commenced in June 1957, was continued on June 16, 1958, when Mr. Schwartz" records were still not made available to Mr. Catrambone. On April 10, 1959, Mr. Schwartz requested an appointment with Mr. Catrambone to allow him to inspect the records, and accordingly, one was arranged for April 29, 1959. Following Mr. Schwartz" cancellation of the meeting, and his failure to set up another, on June 2, 1959, Mr. Catrambone scheduled an appointment for June 24, 1959. An interview was held on July 24, 1959, to which Mr. Schwartz did not bring his records, although requested to do so. The interview was devoted primarily to Mr. Schwartz" records and their availability to Mr. Catrambone. Mr. Schwartz refused to make the records freely accessible to Mr. Catrambone and placed unclear and confusing conditions on the inspection. At no time did Mr. Schwartz ever deliver his records to Mr. Catrambone.
The respondent has conceded that no part of any alleged underpayment of tax for the years 1949, 1954, 1955, and 1956 was due to fraud on the part of Mrs. Schwartz. The respondent has also conceded that if the Court finds that the amount omitted from gross income for each of the years 1949, *92 1954, 1955, and 1956 exceeded 25 percent of the amount of the gross income stated on the return for each of such years, Mrs. Schwartz is entitled to the benefits of section 6013(e) and is not liable for any deficiency attributable to the omission of such amounts from gross income. For such purposes, the following amounts of gross income were reported in Mr. and Mrs. Schwartz" joint Federal income tax returns: Year
Gross Income 1949
$43,238.22
1954
38,603.50
1955
22,882.50
1956
28,612.50 The respondent has conceded that the following amounts represented omitted income under section 6013(e): Year
Item
Amount 1949
Joint venture
$ 3,000.00
Gambling income
30,000.00
1954
Professional income
12,601.92
1955
Professional income
22,651.49
1956
Professional income
34,339.60
Knight dividends
750.61
For the year 1949, the respondent has conceded that forgiveness of a $5,000 loan was not additional consideration for the sale of the interest in the St. George building. Mr. and Mrs. Schwartz failed to file declarations of estimated tax for the years 1949 and 1954, and Mr. Schwartz failed to so file for the years 1952 and 1953. Mr. and Mrs. Schwartz" joint Federal income tax return for the year 1954 was filed on April *93 16, 1956. In his notices of deficiency, the respondent determined that Mr. and Mrs. Schwartz had unreported income for the years 1949 and 1954 through 1956, that Mr. Schwartz had unreported income for the years 1952 and 1953, and that at least part of the underpayments in Federal income taxes for such years was due to fraud. The respondent also disallowed deductions claimed for certain business and personal expenses and a loss on the sale of certain properties, adjusted the amount of gain realized on the sale of an interest in other property, imposed penalties for failure to file declarations of estimated tax, and proposed an overassessment on a penalty for failure to timely file a return. OPINION It is agreed that the statute of limitations bars any assessment of tax for the years 1949, 1952, 1953, 1954, 1955, and 1956, unless the respondent proves that the returns were fraudulent. Sec. 6501(c); sec. 276(a), I.R.C. 1939. In addition, section 6653(b) and section 293(b) provide that if any part of an underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax due an amount equal to 50 percent of the underpayment. Since the respondent has *94 conceded that Mrs. Schwartz was not a party to any fraud for any of such years, the first issue to be considered is whether Mr. Schwartz" conduct constituted fraud for such years. Fraud consists of intentional evasion of payment of a tax believed owed. Mitchell v. Commissioner, 118 F.2d 308 (C.A. 5, 1941), revg. and remg. 40 B.T.A. 424 (1939), supp. opinion 45 B.T.A. 822 (1941). The respondent must demonstrate fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; [5]Blaine S. Fox, 61 T.C. 704 (1974). As direct evidence of the requisite intent is often unobtainable, there may be resort to relevant circumstantial evidence. M. Rea Gano, 19 B.T.A. 518 (1930). We have studied the mass of evidence presented and conclude that at least part of the underpayment of taxes in each year was clearly due to fraud. Mr. Schwartz repeatedly and consistently understated his taxable income by significant amounts over the years at issue: Year
Amount of Understatement 1949
$ 40,848.14
1952
56,363.61
1953
15,892.17
1954
17,611.58
1955
30,700.74
1956 39,990.21
Total
$201,406.45
It *95 often has been held that a pattern of underreporting taxable income is evidence of fraud. Schwarzkopf v. Commissioner, 246 F.2d 731 (C.A. 3, 1957), affg. a Memorandum Opinion of this Court; Kathleen C. Vannaman, 54 T.C. 1011 (1970); Madeline V. Smith, 32 T.C. 985 (1959). In Vannaman, the Court, in finding fraud, relied in part on the fact that over 6 consecutive years a total of $129,197.09 of taxable income has not been reported. In that case, the underreporting ranged from a low of $7,699.98 in 1960 to a high of $47,087.13 in 1958. In the present case, the underreporting ranged from $15,892.17 in 1953 to $56,363.61 in 1952 and reached a total of $201,406.45 for all 6 years. Consequently, Mr. Schwartz" repeated failure to report such income on his returns provides persuasive evidence of fraud. However, there is also a considerable amount of other evidence of fraud. Mr. Schwartz" noncooperation with the IRS investigation is another indication of fraud. He claimed to Mr. Catrambone that he kept "fairly complete and accurate" records and that they were extant during the course of the investigation. Yet, when Mr. Catrambone made many requests over a period of years to inspect *96 them, they were never made available, excuses were given, appointments were not kept, and Mr. Schwartz placed unclear conditions on their availability. Although Mr. Schwartz claimed that the records were always open to Mr. Catrambone, his assertion of cooperation cannot be sustained, in view of his evasiveness, his dilatoriness in keeping interviews with Mr. Catrambone, and his failure to produce such records when interviews were actually held. Obstruction of an IRS investigation has been considered a factor indicating fraud. Mladinich v. United States, 394 F.2d 147 (C.A. 5, 1968); Robert Neaderland, 52 T.C. 532 (1969), affd. 424 F.2d 639 (C.A. 2, 1970), cert. denied 400 U.S. 827 (1970); Lillian Kilpatrick, 22 T.C. 446 (1954), affd. 227 F.2d 240 (C.A. 5, 1955); see Spies v. United States, 317 U.S. 492 (1943); cf. William G. Stratton, 54 T.C. 255 (1970). In view of the long history of Mr. Schwartz" noncooperation with Mr. Catrambone, we must conclude that it was a deliberate effort on his part to hinder the investigation, and that such deliberate obstruction suggests fraud. In addition, certain transactions, reported by Mr. Schwartz as capital gains, were in reality compensatory *97 arrangements, and in our judgment, such misreporting was due to fraud. In Victor A. Dorsey, 33 B.T.A. 295 (1935), on his Federal income tax return, the petitioner reported capital gains from the sale of certain stock. The Court determined that the erroneous reporting was clearly due to fraud, since the amounts received were, in actuality, compensation. The stock alleged to have been sold was never owned or sold by the taxpayer; he had no cost basis in the stock although he had claimed such a basis in his return. The taxpayer was aware of these facts and indubitably knew that the payment was compensation for certain sales efforts. From 1952 through 1956, Mr. Schwartz received a total of $37,704.45 from General, which he reported as capital gains of $34,000.00 in 1953, although, in that year, he received only $4,000.00 from General. Mr. Schwartz argued that the sums he received were payment for the sale of his interest in General and hence correctly reported as capital gains. However, Mr. Schwartz never acquired any interest in General which he could have sold later. Although the April 1952 agreement called for him to make an investment, we have found as a fact that he never invested *98 any funds in General. Nor is there any evidence indicating that the other investors transferred parts of their interests to him. Furthermore, there is significant affirmative evidence that the payments were compensatory. The October 1952 agreement voided the April 1952 agreement which provided for Mr. Schwartz to acquire an ownership interest in General and instead called for a series of payments to be made to him which were described as compensation. It did not mention or indicate in any way that the payments were in return for Mr. Schwartz relinquishing an interest in General. In an affidavit prepared in 1956, Mr. Schwartz swore that the payment he had received in 1952 was compensation for services he performed for General. Considering that the payments were intended to be compensatory, that Mr. Schwartz had no ownership interest in General, and that he was aware of the character of the payments, his misreporting raises an inference of fraud. Victor A. Dorsey, supra.An additional indication of fraud, in connection with this transaction, is his reporting of the total amount as received in 1953 - a year in which he had a large capital loss so that the reported gain was not taxable *99 at all - instead of reporting the payments from General as they were received over the years. Meldon v. Commissioner, 225 F.2d 467 (C.A. 3, 1955), affg. on this issue a Memorandum Opinion of this Court. Mr. Schwartz" treatment of the $10,000 he received from Mr. Steiner in 1954 constitutes additional evidence of fraud. Mr. Schwartz argued that he was not the intended recipient of the proceeds of the check but that Mr. Steiner intended for him to be a mere conduit to channel the funds to the investment in the Venezuelan enterprise. However, there was abundant evidence clearly showing that the payment was intended to compensate Mr. Schwartz. It was given in response to a bill from Mr. Schwartz to Mr. Steiner for the same amount, and near the same time, Mr. Schwartz gave Mr. Steiner a receipt for payment for services rendered. Mr. Steiner testified at trial that the payment was compensatory. In addition, the evidence indicated that Mr. Steiner did not intend to use Mr. Schwartz as a conduit for an investment. Mr. Steiner had no concern in the Venezuelan enterprise until Mr. Schwartz introduced him to the other investors. At all times after delivery of the check, Mr. Schwartz had *100 the exclusive interest in it. The respondent argued that Mr. Schwartz received a $7,500 commission from his participation in the sale of the Fretz building, that the payment was compensatory, and that his treatment of the payment was fraudulent. Essentially, Mr. Schwartz took the position that he received nothing in 1955 and realized only capital gains in 1956, when he sold the Knight stock. His position appears to be that the other investors were reluctant to consummate the purchase of the Fretz building unless Mr. Schwartz invested in Knight, and that there were substantial restrictions on the payment made in 1955 which prevented him from realizing any income in that year. Since the respondent did not proffer any evidence which might tend to indicate that he would have earned the commission even if the sale of the Fretz building did not take place or that Mr. Schwartz could have sold the Knight stock before it was actually sold, Mr. Schwartz" failure to report the payment in 1955 does not raise an inference of fraud. However, as the payment, when made, was intended to be compensation, Mr. Schwartz" failure to report at least part of the proceeds of the sale of the stock in 1956 *101 raises an inference of fraud for such year. See Commissioner v. LoBue, 351 U.S. 243 (1956), rehrg. denied 352 U.S. 859 (1956); Ford S. Worthy, Jr., 62 T.C. [*] (June 12, 1974). Mr. Schwartz" reporting of the payment he received from the Masterpiece settlement was erroneous; as the payment was compensation, it should not have been treated as capital gains. Harry Friedman, 45 B.T.A. 976 (1941), affd. 130 F.2d 305 (C.A. 4, 1942). Mr. Schwartz never invested in Masterpiece, nor did he have any interest in its assets. His claim was based on the right to the compensation earned by him and Mr. Schofield through the services they had performed with respect to the original litigation. In these circumstances, treatment of the payment as capital gains was erroneous and suggestive of fraud. Attempting to negate any inference of fraud from these events, Mr. Schwartz argued that proper reporting procedures are a matter of opinion and that he was merely treating these payments in accordance with his interpretation of the applicable law. William G. Stratton, 54 T.C. 255 (1970). Generally speaking, mistakes in law are not indicia of fraudulent intent and are not penalized as such. Spies v. United States, 317 U.S. 492 (1943); *102 Welburn Mayock, 32 T.C. 966 (1959). Yet, for that rule to apply, the circumstances must be such as to allow a reasonable, albeit mistaken, understanding by the taxpayer that his conduct was in accordance with the law. Compare William G. Stratton, supra, with Robert Neaderland, 52 T.C. 532 (1969). Furthermore, any claim of ignorance or honest mistake must be weighed in the light of the petitioner's business knowledge, education, and experience. Robert Neaderland, supra; Chas. F. Long, 12 B.T.A. 488 (1928). In the four situations, Mr. Schwartz treated payments he had received in the context of employment relationships as capital transactions. Alone, each transaction does not clearly and convincingly demonstrate fraud. However, consistently treating compensatory payments received in such diverse employment situations as being capital items precludes an inference of honest mistake. Instead, it indicates a willingness to utilize any plausible reason to treat such payments as capital items; it also shows a deliberate, sustained effort to conceal the true character of the payments. Spies v. United States, supra; Victor A. Dorsey, 33 B.T.A. 295 (1935). In addition, Mr. Schwartz had years *103 of experience as a lawyer, had taken tax courses, and in his work had specialized in the financial affairs of business enterprises. In view of his knowledge and experience, we can expect Mr. Schwartz to have greater understanding of the proper treatment of these transactions than a man without his background. After weighing all the evidence and considering his experience, we are convinced that Mr. Schwartz" repeated treatment of compensatory arrangements as capital transactions was not due to ignorance but must have been due to a fraudulent purpose. Kathleen C. Vannaman, 54 T.C. 1011 (1970); Victor A. Dorsey, supra.
There are also other acts indicative of fraud during the years at issue. Although each case must be judged on its own facts and a determination reached on the basis of the whole record, the amount of omitted income, and the duration of such practice, have been considered relevant. Lowell F. Bushnell, 49 T.C. 296 (1967); Madeline V. Smith, 32 T.C. 985 (1959). It should also be considered whether negligence or carelessness caused the omissions or misreporting. William H. Parsons, 43 T.C. 378 (1964). In 1949, Mr. Schwartz failed to report $30,000 of gambling winnings. *104 From 1952 through 1956, he failed to report a total of $37,704.45 of compensation from General. In 1954 and 1955, he failed to report $10,000 and $4,000 of compensation he received respectively for each year from Mr. Steiner.For the year 1956, Mr. Schwartz failed to report the commission he received from his participation in the sale of the Fretz building and instead treated the payment as a capital gain. The respondent maintained that Mr. Schwartz" treatment of the sale of the Frankford properties raised a clear inference of fraud for the year 1949. It was his position that the sale occurred in 1950, and taking a loss on the sale in 1949 indicated fraud. The petitioner argued that, for Federal income tax purposes, the sale took place in 1949, since he and Mrs. Schwartz effectively relinquished control over the Frankford properties in that year. Mr. and Mrs. Schwartz acquired the properties for a total price of $35,500.00; in November 1949, they were transferred to Helene Nathanson for no consideration, and in July 1950, they were further transferred for $33,500.00, of which Mr. and Mrs. Schwartz effectively received at least $29,131.99, including proceeds paid to them and the *105 mortgagee. Under these facts, it was not possible for Mr. and Mrs. Schwartz to sustain a capital loss of $12,000 in 1949. They have made no claim that they made a gift of the properties or transferred them for no consideration; thus, their loss was at most $2,000 - their cost less the payment made by Evelyn Patterson. As Mr. Schwartz could have no doubt but that his reporting was erroneous, fraud seems indicated therein also. Robert Neaderland, 52 T.C. 532 (1969). Considering his professional background, Mr. Schwartz" failure to report his gambling income in 1949 and his improper treatment of the sale of the Frankford properties provide additional support for the conclusion that his conduct was fraudulent. For each year at issue, the respondent has clearly and convincingly shown fraud. In 1949, the petitioners failed to report gambling winnings and erroneously reported a capital loss. In 1952 through 1956, Mr. Schwartz failed to report compensation from General. In 1954 and 1955, he failed to report compensation from Mr. Steiner.For 1956, Mr. Schwartz failed to treat some of his gain from the sale of the Knight stock as compensation. For 1956, he failed to treat as compensation *106 the amount he received from the settlement of the Masterpiece litigation. For each year at issue, Mr. Schwartz substantially understated his taxable income. Mr. Schwartz" attempted obstruction of the IRS investigation also indicates fraud. For these reasons, we find and hold that fraud has been shown for each of the years 1949, 1952, 1953, 1954, 1955, and 1956, that the statute of limitations has not run for such years, and that any deficiencies may still be assessed for such years. Sec. 6501(c) (1); sec. 276(c), I.R.C. 1939. Fraud having been established, it must next be considered whether there are deficiencies in income taxes due from the petitioners. The burden of proof shifts to the petitioners on this issue. Rule 142(a); Leonard B. Willits, 36 B.T.A. 294 (1937). The respondent reconstructed the petitioners' taxable income through the bank deposits method. This method indicated that for the years 1952, 1953, 1955, and 1956, there were substantial unexplained deposits in the petitioners' various bank accounts. Unless such deposits are shown by the petitioners to represent other than taxable income, they will be treated as taxable income. John Harper, 54 T.C. 1121 (1970); *107 Emanuel Hollman, 38 T.C. 251 (1962); Herman J. Romer, 28 T.C. 1228 (1957). In attempting to refute the inference that such deposits represented taxable income, Mr. Schwartz argued that many of them were actually loans or stemmed from churned accounts. While testimony adduced at trial indicated that Mr. Schwartz did a substantial amount of borrowing, no testimony was presented which identified the deposits claimed to be loans. Similarly, there was no evidence concerning which amounts were actually redeposits of amounts deposited elsewhere, and our independent analysis of transcripts of bank records yielded no such information. Consequently, it must be concluded that the full amount of the unexplained bank deposits is taxable income. Henry M. Rodney, 53 T.C. 287 (1969); compare Robert M. Brittingham, 57 T.C. 91 (1971). There are three disputed items concerning the reconstruction of income for the year 1949: The gambling winnings, the loss on the sale of the Frankford properties, and the sale price of the interest in the St. George building. Mr. Schwartz argued that the inclusion of the $30,000 gambling winnings in his income for the year 1949 was erroneous. He maintained that his *108 gambling winnings were never as high as his losses. However, beyond making that assertion at trial and at an interview with Mr. Catrambone in 1959, he presented no other evidence which might support his assertion, and consequently, it cannot be upheld. Stein v. Commissioner, 322 F.2d 78 (C.A. 5, 1963), affg. a Memorandum Opinion of this Court. Furthermore, sufficient reliable evidence was adduced on which the finding of gambling winnings was based. At the 1958 interview with Mr. Catrambone, Mr. Schwartz stated that he gambled extensively during a period including the year 1949. He also stated that he gambled in Miami, Florida, the city where the alleged payor of the winnings was located. The payor was also a known gambler, known to be such to Mr. Catrambone who testified to that effect at trial. In the light of these facts, and considering that Mr. Schwartz had the burden of proving that he did not receive the gambling income, it must be concluded that the payment represented gambling winnings. In support of his claim that a loss of $12,000 was sustained from the sale of the Frankford properties in 1949, Mr. Schwartz argued that 1949 was the correct year in which to report the *109 transaction because the transfer to Helene Nathanson extinguished his and Mrs. Schwartz" interest in the properties. At trial, he introduced a letter written by an Oscar Brown to him on December 13, 1949. The letter detailed distributions made pursuant to a "Laupheimer, Steiner and Posey Schwartz transaction." According to the letter, Mr. Brown was forwarding $87.88 to Mr. Schwartz, having already disbursed the following amounts: $500.00 to Mr. Schwartz, $11,465.20 to satisfy a "Wolf, Esquire - Potamkin Judgment," and $696.92 for various sums due pursuant to the transfer of real estate. The date of sale, the sellers and purchasers, and the location of the property were not identified. At trial, Mr. Brown testified that he could not remember the transaction and attempted to reconstruct it. He concluded that the letter could have been describing the Frankford properties sale because of the similarity of two names in the two transactions. However, a comparison of the amounts disbursed in the transaction described in the letter and the settlement occurring in July 1950 shows no similarities; in every respect they are different. Considering Mr. Brown's failure to identify the transaction *110 recounted in the letter and its own failure to coincide with the 1950 settlement, it must be concluded that the letter has no probative effect on the issue of when the sale of the Frankford properties took place. Mr. Schwartz also argued that a transfer to a "straw party" without consideration triggers realization for Federal income tax purposes. However, the circumstances of the 1949 and 1950 transfers clearly show that the 1949 transfer must be disregarded for Federal income tax purposes. Mr. and Mrs. Schwartz acquired the properties for $35,500 and, within 7 and 15 months of their respective acquisitions, transferred them to Helene Nathanson without consideration. There was no indication that the properties became worthless in 1949 and that Mr. Schwartz intended to transfer them without receiving consideration therefor at some time. To the contrary, the 1950 transfer for $33,500 indicates that their value did not decrease so substantially. The failure of the petitioners to receive anything in exchange for the properties in 1949, when the properties had some market value, implies that such transfer lacked susbstance. Clarence L. Hook, 58 T.C. 267 (1972). Belying Mr. Schwartz" *111 contention that he and Mrs. Schwartz relinquished their interests in the properties in 1949 is the fact that they received part of the proceeds from the 1950 transfer. Such fact indicates that they had a continuing interest in the properties until 1950 and that Helene Nathanson was a mere conduit for the properties to be transferred later. James M. Hallowell, 56 T.C. 600 (1971). Since the 1949 transfer did not constitute a sale for Federal income tax purposes, it must be disregarded for such purposes. The respondent also proposed an adjustment in the sales price of the interest in the St. George building. The statutory notice stated that: Gain on the sale of property at 1301 Arch St. has been adjusted as follows: Selling price, for your interest $31,000.00 At the trial, he attempted to show that $28,000 was paid for Mrs. Schwartz" interest in the building and that $3,000 was paid for her interest in assets other than the building. Mrs. Schwartz contended that the issue of gain from these "other assets" is a new issue raised at trial, not indicated on the statutory notice, and consequently, the respondent bears the burden of proof on this question. Rule 142(a). The issue therefore *112 raised is whether Mrs. Schwartz was put on notice that the respondent would attempt to show that there was gain from the sale of something other than real estate. The notice specifically referred to property located at 1301 Arch St.; it did not mention any other assets. In view of the notice's failure to specify the "other assets," it must be concluded that the respondent's attempted proof of payment made for such "other assets" constituted a new issue raised at trial on which the respondent must bear the burden of proof. The settlement sheet made pursuant to the transfer of the interest in the real estate was introduced at trial and indicated a total purchase price of $28,000 for the interest in the building. Also admitted was an affidavit concerning the transaction prepared in 1959 by one of the purchasers of the interest, Samuel Frankel. Included in the affidavit was the statement that: In addition to the purchase price of $28,000.00 for the building, Posey Schwartz was also to receive $3,000.00 from the Joint Venture in consideration of assigning all of her interest in the Assets of the Joint Venture, except the real estate. Mr. Frankel's testimony revealed that, at the time *113 of the trial, he was uncertain as to what was paid for the interest in the building and what other interests may have been transferred at the same time. However, he believed that at the time he made the affidavit in 1959 he was still familiar with those facts and that the affidavit was correct. It is clear that at the time of making the affidavit, his memory was much more likely to be correct, and for that reason, we have concluded that the facts set forth in the affidavit are more reliable than his testimony given 14 years later. Consequently, we hold that the respondent has carried his burden of proof and has established that Mrs. Schwartz sold her interest in the St. George building for $28,000 and her interest in other assets of the joint venture for $3,000. The petitioners presented no arguments concerning the respondent's treatment of the payments from General, Mr. Steiner, and Masterpiece as compensation beyond what has been discussed previously. Since we have found that those payments were not capital gains, the respondent's determinations are accepted. In addition, the petitioners did not contest the inclusion of dividends on the Knight stock in income for 1956, and *114 therefore, the respondent's determination as to their inclusion must be accepted also. The $7,500 payment from Knight was taxable in 1956 because until then there were apparently conditions and restrictions on Mr. Schwartz" right to it. In computing Mr. Schwartz" professional and business income for purposes of the trial, the respondent proposed, for the years 1952 through 1956, to add Mr. Schwartz" unexplained bank deposits, his identified but unreported income, and his reported income. There is an obvious question as to whether the reported income was in addition to the unexplained bank deposits or whether there might be some duplication between the unexplained bank deposits and the reported income. However, Mr. Schwartz offered no evidence as to whether there was any duplication in those items of income. In addition, the respondent, in his notices of deficiency, had arrived at smaller amounts of professional and business income, and he conceded that those lesser amounts should be used for purposes of computing the deficiencies in this case. Under the circumstances, we have, in our findings, relied upon the lesser amounts of business and professional income used in the notices *115 of deficiency. For each year at issue, the respondent made certain adjustments in the petitioners' taxable income based on the disallowance of various deductions. The petitioners disputed some of the disallowances for the years 1952 through 1956, although they agreed to those made for the year 1949 prior to the issuance of the statutory notice for that year. Of the deductions disallowed for the years 1952 through 1956, the petitioners presented evidence and arguments concerning only three items: interest expenses, travel expenses, and entertainment expenses. Consequently, they must be considered as having conceded the other disallowances. [6] *116 At the trial of this case, no records supporting these deductions were introduced, and recognizing this fact, Mrs. Schwartz argued that Cohan v. Commissioner, 39 F.2d 540 (C.A. 2, 1930), ought to be applied here. A significant amount of testimony was presented from which it could be inferred that Mr. Schwartz had spent sums on business trips, paid interest charged on loans, and incurred entertainment expenses. In part, Mrs. Schwartz relied on several bills and invoices as showing payment for some hotel and stenographic expenses, but since none of them indicated whether they were paid in the course of business activities, they have no evidentiary value. No other testimony or evidence was presented from which the amount, nature, and year of travel, entertainment, and interest expenditures might be inferred. The evidence as to the amount of money borrowed and the interest paid is so vague that we are unable to conclude that for any particular year any amount should be allowed as a deduction for such interest. John T. Steen, 61 T.C. 298 (1973), on appeal (C.A. 5, May 2, 1974). However, we are satisfied *117 that in the course of his practice of law and other business activities, Mr. Schwartz did incur expenses for travel and entertainment and that some deduction should be allowed as a result of such e-penditures,. In view of the paucity of the evidence, it is difficult to conclude what amounts should be deductible, and in such circumstances, the ambiguity must be resolved against the claimed deduction. Cohan v. Commissioner, supra; Sidney Merians, 60 T.C. 187 (1973). Accordingly, we hold that Mr. Schwartz may deduct $500 a year for each of the years 1952, 1953, 1954, 1955, and 1956 to cover his business travel and entertainment expenses. Although the respondent has conceded that Mrs. Schwartz is not liable for any fraud penalties for the years 1949 and 1954 through 1956, she is liable for deficiencies for those years, except to the extent section 6013(e) relieves her of such liability. Nathaniel M. Stone, 56 T.C. 213 (1971). Under that provision, an innocent spouse who signs a joint return is relieved of liability for a deficiency in tax attributable to the omission of income of the other spouse, if the omitted income exceeds 25 percent of the income stated on the return, if the innocent *118 spouse did not know of the omission (and had no reason to know of it), and if it would be inequitable to hold the innocent spouse liable for the deficiency. The respondent has conceded that Mrs. Schwartz is an innocent spouse under section 6013(e). Since, for each year, the amounts omitted were significantly in excess of 25 percent of the amounts of gross income reported, Mrs. Schwartz is entitled to the benefits of section 6013(e) for the amounts so omitted. In our findings of fact, we have set forth the amounts of omitted income for this purpose. The next issue posed herein is the petitioners' liability for failure to file declarations of estimated tax for the years 1949 and 1954 and Mr. Schwartz" individual liability for his failure to so file for the years 1952 and 1953. Sec. 294(d) (1) (A). Under that provision, an addition to tax is imposed on a taxpayer who fails to make a timely declaration of estimated tax, unless the failure is due to reasonable cause. When, as here, the respondent determines that such addition to tax is due, the petitioners have the burden of proving either that they did make a timely declaration or that the failure to file was due to reasonable cause. *119 Rene R. Bouche, 18 T.C. 144 (1952). No evidence was presented concerning whether such declarations were actually filed, and thus, it must be concluded that they were not filed. Moreover, although in his petition and reply, Mr. Schwartz implicitly denied liability for such penalties, his failure to present any evidence and his failure to make any arguments in his brief on the issue warrants a conclusion that he has conceded that he is liable for such penalties. Paula Construction Co., 58 T.C. 1055 (1972), affd. without published opinion 474 F.2d 1345 (C.A. 5, 1973). Under section 58(a), I.R.C. 1939, Mrs. Schwartz was not required to file such declarations and is consequently not liable for any penalties imposed under section 294(d) (1) (A). During the years 1949 and 1954, she had no independent income of her own. Although she was named the owner of an interest in the St. George building, the respondent conceded, and we have found, that she was a mere nominee for Mr. Schwartz with respect to it. As such, the income from the sale was not heres, but Mr. Schwartz", and thus, she need not have filed the declaration on the basis of receiving any income from the sale of the St. George *120 building. Solomon v. Commissioner, 204 F.2d 562 (C.A. 4, 1953), affg. a Memorandum Opinion of this Court; Edwin B. Michael, Administrator, 16 B.T.A. 1365 (1929). On brief, the respondent also argued that the petitioners are liable for additions to tax for failure to timely file their 1954 joint Federal income tax return. Sec. 6651(a). The only mention made of this penalty in the statutory notice was that there was an overassessment with respect to it. Consequently, we hold that the issue was not properly raised by the notice of deficiency and that we cannot consider such an issue when first raised in a brief. Aubrey S. Nash, 31 T.C. 569 (1958). Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Posey Schwartz, docket No. 6222-70; and Milton H. L. Schwartz, docket No. 6232-70. ↩
2. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated. ↩
4. Any reference to sec. 294(d) (1) (A)↩ is to that section of the Internal Revenue Code of 1939. 3. The addition to tax for fraud for the years subject to the Internal Revenue Code of 1939 were assessed under sec. 293(b) of that Code. Any reference to such section is to that section of that Code. ↩
5. All references to Rules are to the Tax Court Rules of Practice and Procedure. ↩
6. No interest or accident expense was deducted in 1955 nor was any $1,000 figure deducted. However, the respondent's deficiency notice disallowed a $1,000 interest deduction for the year 1955. Since Mr. Schwartz never mentioned the disallowance and since Mrs. Schwartz particularly argued for the deductibility of such expense in 1955, a $1,000 interest expense shall be treated as having been deducted in and disallowed for 1955. However, on their 1956 joint Federal income tax return, the petitioners took a deduction for $1,000 pursuant to an expense labeled "accident"; such deduction was not disallowed by the respondent.