EDWARD J. JEDINAK and LUCILLE M. JEDINAK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jedinak v. Commissioner
Docket No. 2754-75.
United States Tax Court
T.C. Memo 1978-227; 1978 Tax Ct. Memo LEXIS 291; 37 T.C.M. (CCH) 965; T.C.M. (RIA) 78227; June 19, 1978, Filed *291 P operated a numbers business from 1968 through 1971 but reported no income from such business on his Federal income tax returns for such years. Held: (1) P grossly understated his income each year from 1968 through 1971; (2) some part of the underpayment for each of the years at issue was due to P's fraud with intent to evade tax within the meaning of sec. 6653(b), I.R.C. 1954; (3) the Commissioner has failed to prove that any part of the underpayment was due to fraud on the part of P's wife; (4) P's wife has not proved that she is entitled to the relief from liability for the deficiencies provided by sec. 6013(e)(1), I.R.C. 1954; and (5) there is no basis for suppressing any evidence admitted at the trial. Maurice A. Nernberg, Jr., for the petitioners. Robert J. Percy, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, *293 and additions to, the petitioners' Federal income taxes: Addition
Sec. 6653(b) Year
Deficiency
I.R.C. 1954 [1]
1968
$ 43,602.76
$ 21,801.38
1969
13,238.25
6,619.13
1970
7,420.43
3,710.22
1971
3,539.46
1,769.73
The Commissioner has conceded certain adjustments for each year. The issues for decision are: (1) Whether the petitioners understated their income during each of the years in issue; (2) whether any part of the underpayment of taxes for the years in issue was due to fraud with intent to evade tax by either of the petitioners within the meaning of section 6653(b); (3) whether the statute of limitations bars assessment of deficiencies in income and additions thereto; (4) whether the petitioner Lucille M. Jedinak is relieved from liability for the deficiencies under the "innocent spouse" provisions of section 6013(e); and (5) whether any documentary evidence in this case should be suppressed because of the revenue agent's failure to warn the petitioners of their alleged constitutional rights. FINDINGS OF *294 FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Edward J. Jedinak and Lucille M. Jedinak, husband and wife, resided in Pittsburgh, Pa., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1968, 1969, 1970, and 1971 with the Internal Revenue Service Center, Philadelphia, Pa. The petitioners reported their income and deductions by use of the cash method of accounting. On January 7, 1964, Mr. Jedinak filed a petition in bankruptcy with the United States District Court for the Western District of Pennsylvania. In such petition, Mr. Jedinak represented under oath that his nonexempt assets had a fair market value of $ 28,416.82, that his liabilities had a fair market value of $ 28,685.06, that he had lost approximately $ 20,000.00 gambling during 1963 that he had transferred no property during the year immediately preceding the filing of the bankruptcy petition, and that he had no cash on hand at the time of filing such petition. In addition, Mr. Jedinak testified that he had not transferred any property for less than its fair market value at any time prior to January 7, 1964. In *295 due course, Mr. Jedinak was declared bankrupt and given a discharge from indebtedness. For the years 1965 through 1967, the petitioners filed joint Federal income tax returns, on which they reported income of $ 3,456.05 in 1965, $ 4,176.90 in 1966, and $ 7,590.00 in 1967. From 1968 through 1971, Mr. Jedinak operated a numbers business in Pittsburgh, Pa. Such business is basically a lottery in which people generally bet money on three-digit numbers. The winning number, which is picked daily, is determined by reference to various numbers or combinations of numbers derived from some predetermined source, such as the daily newspaper. The odds against winning are generally around 500 or 600 to 1, but the payoffs for the winning number reflect the odds. Betting was done on a daily or weekly basis. Although Mr. Jedinak permitted certain customers to bet on credit, all payoffs, whether winnings or losses, were ultimately made in cash. Mr. Jedinak conducted his numbers business with the expectation of making a profit, and during each of the years in issue, he paid protection money of $ 250 a month "to keep away the law." During the years in issue, Mrs. Jedinak worked as a registered *296 nurse at Braddock General Hospital, Braddock, Pa. On their Federal income tax returns for 1968 through 1971, the petitioners reported income of $ 16,424.00 in 1968, $ 6,915.00 in 1969, $ 8,394.00 in 1970, and $ 8,888.00 in 1971. Such amounts included dividends, interest, gains and losses from numerous stock transactions, and Mrs. Jedinak's wages. The petitioners reported no income from Mr. Jedinak's numbers business on such tax returns. During the years in issue, the petitioners had separate checking accounts and at diverse times had as many as four joint savings accounts at Pittsburgh National Bank (PNB). [2] Their deposits in such accounts and their cash expenditures not traceable to such deposits greatly exceeded their reported income. After making adjustments for Mrs. Jedinak's net wages, the redemption of a savings certificate, a Federal income tax refund, and the proceeds available for deposit from the sale of securities and from dividends, the petitioners' bank deposits and cash expenditures exceeded their reported income by $ 82,860.17 in 1968, $ 31,237.00 in 1969, $ 22,737.12 in 1970, and $ 12,544.88 in 1971. Virtually all of the deposits to the petitioners' checking *297 accounts were made in cash. On October 7, 1970, the petitioners leased safe deposit box 138 at the Miracle Mile branch office of PNB. According to the access record card, Mr. Jedinak had access to such box four times in 1970 and nine times in 1971, and Mrs. Jedinak had no access to such box during 1970 and 1971. Mrs. Jedinak and her sister also leased a safe deposit box with PNB. However, the access record card showed that neither lessee had any access to such box during 1968 through 1971. The petitioners had no checking accounts or savings accounts during the years in issue other than those included in the bank deposits and cash expenditures computation. In addition, they had no certificates of deposit or safe deposit boxes from January 7, 1964 through December 31, 1971, other than those previously discussed. On each tax return for the years 1968 through 1971, Mr. Jedinak listed his occupation as "retired." From 1937 through 1970, the petitioners reported the following earnings to the *298 Social Security Administration: Year
Mr. Jedinak
Mrs. Jedinak
1937
$ 976.80
1948
$ 615.00
1949
1,380.00
1950
1,380.00
1951
1,978.91
1,072.00
1952
1,929.89
1,380.00
1953
1,300.00
1954 600.00
830.88
1955
3,445.00
3,242.96
1956
3,900.00
3,414.09
1957
3,900.00
2,453.19
1958
4,200.00
619.47
1959 4,799.00
68.85
1960
1,100.00
1961
1,844.55
1962
1,959.23
1965
3,486.05
1966
4,176.06
1967
410.00
6,190.49
1968
6,404.44
1969
6,894.11
1970
7,714.43
On August 8, 1967, the petitioners paid $ 5,000.00 in cash to purchase a cottage on Connoquenessing Creek, in Butler County, Pa. On December 2, 1968, the petitioners' home in Pittsburgh was burglarized. According to the police report, a safe in the petitioners' bedroom had been opened by a blow torch, and their bedroom had been ransacked. Mr. Jedinak estimated that $ 30,490.00 worth of stocks and bonds and miscellaneous articles had been stolen, even though approximately $ 320.00 in coins had been left in the safe. Mrs. Jedinak has been a registered nurse since approximately 1941. Prior to 1965, she worked as a nurse in a doctor's office; *299 thereafter, she worked full-time at Braddock General Hospital. Mrs. Jedinak knew of her husband's numbers activities, but she paid no attention to them. She surmised that her husband anticipated making a profit in his gambling activities, but she had no idea whether he actually made any profit or whether he reported the income from such activities on their Federal income tax returns for the years in issue. Mrs. Jedinak had no knowledge of her husband's alleged cash hoard or of his numerous stock transactions. Mrs. Jedinak did not participate in, nor was she the least bit familiar with, the family's finances. Mr. Jedinak took care of all the financial matters: He kept the books and records, he balanced the checkbooks, checked over the monthly bank statements, paid all the bills, made all deposits in the various bank accounts, and arranged for the preparation of their joint tax returns. Mrs. Jedinak participated in the family finances to the extent that she gave her husband her weekly check and that she signed whatever papers or documents he instructed her to sign. She signed the mortgage, the signature cards for the joint bank accounts, and the tax returns for the years in *300 issue. In addition, she signed all of the checks drawn on her personal checking account, although she did not prepare them. Her husband instructed her to sign either blank checks or checks he had prepared, and she did so without asking any questions. In fact, Mrs. Jedinak did whatever her husband requested in financial matters. As of December 31, 1971, the petitioners jointly owned, either as joint tenants or as tenants by the entirety, stocks in mutual funds and other corporations which had been purchased from 1968 through 1971 at a cost of tens of thousands of dollars. In addition, they had a cash balance of approximately $ 4,300 in their joint savings accounts. The petitioners' tax returns for the years 1968 through 1971 had previously been considered by the Intelligence Division of the IRS which investigates criminal fraud, but the Intelligence Division had declined to recommend a criminal action. Thereafter, in 1973, revenue agent John R. Barney was assigned to conduct a civil audit of the petitioners' returns. Upon receiving the Jedinaks' file which already contained certain information regarding their bank deposits during 1968 through 1971, Mr. Barney reviewed *301 the Intelligence file and conferred with the special agent who conducted the prior investigation. Thereafter, Mr. Barney did a preliminary bank deposits and cash expenditures computation, which revealed that such deposits and expenditures greatly exceeded the Jedinaks' reported income. On February 7, 1973, Mr. Barney contacted the attorney who had represented the Jedinaks during the criminal investigation and told him that he would be conducting a civil audit of the Jedinaks' returns for the years 1968 through 1971. On February 16, 1973, Mr. Barney and Mr. Jedinak met at the attorney's office, where the audit commenced. At that meeting, Mr. Jedinak informed Mr. Barney that most of his records had been destroyed in a flood. Subsequently, on February 21, 1973, Mr. Barney and Mr. Jedinak had another meeting. At this meeting, Mr. Barney confronted Mr. Jedinak with the fact that his bank deposits and cash expenditures for 1968 exceeded his reported income. Mr. Jedinak contended that the excess did not represent income; he claimed that he had accumulated cash reserves of $ 50,000 to $ 60,000 prior to 1964 and that these reserves accounted for the excess. He explained that his cash *302 hoard consisted of the proceeds from the sale of earlier businesses and from personal loans to him. However, he said he could not verify the personal loans because he did not want to be indebted or obliged to anyone by asking them to corroborate that they had loaned him money. At the conclusion of this meeting, Mr. Barney informed Mr. Jedinak that the civil fraud penalty would be assessed. On March 26, 1973, Mr. Barney and Mr. Jedinak had another meeting during which Mr. Jedinak provided Mr. Barney with certain documents which were offered to show that certain transactions took place prior to 1962 and that as a result of such transactions, sufficient funds existed to accumulate a cash hoard of $ 85,000. Mr. Barney told Mr. Jedinak he would consider the information. Later during the same meeting, Mr. Jedinak also revealed for the first time that he had been declared bankrupt and received a discharge from indebtedness in 1964. Mr. Barney asked Mr. Jedinak whether he had lost everything as a result of such bankruptcy, and Mr. Jedinak answered that he had not, since he had transferred everything to his wife prior to filing for bankruptcy.Mr. Jedinak also told Mr. Barney that he *303 had lied when he stated under oath on his bankruptcy petition that he had no cash on hand. On March 27, 1973, Mr. Barney ordered a copy of Mr. Jedinak's bankruptcy petition. He received such petition on April 2, 1973, and based on Mr. Jedinak's representation under oath contained therein, Mr. Barney suspected criminal fraud. Accordingly, Mr. Jedinak's case was again referred to the Intelligence Division. On April 18, 1973, Mr. Barney met with a special agent of the Intelligence Division to review the Jedinaks' file. After consideration by the Intelligence Division, the referral was declined and, thereafter, Mr. Barney continued his civil audit. At no time during such civil audit did Mr. Barney make any statement to Mr. Jedinak concerning any constitutional rights. OPINION Issue 1. Deficiencies
The first issue for decision is whether the petitioners had unreported income during each of the years in issue. Because of the inadequacy of the petitioners' records, the Commissioner reconstructed their income during such years by using the bank deposits and cash expenditures method. See secs. 6001, 446; sec. 1.446-1, Income Tax Regs. Under such method, the Commissioner *304 added all of the petitioners' bank deposits and their known cash expenditures during each of the years in issue. From this total, he subtracted all items which were traceable to nontaxable sources, were duplicative, or were otherwise not currently taxable. In addition, all of the petitioners' current income which could have found its way into such bank deposits was subtracted from the total. The excess bank deposits and cash expenditures resulting from such adjustments represented the petitioners' unreported income. See generally, R. Schmidt, "Reconstruction of Income," 19 Tax L. Rev. 277 (1963). The petitioners do not question the propriety of using this method to reconstruct their income, and clearly, under the circumstances, its use was reasonable. Reaves v. Commissioner,31 T.C. 690, 717-718 (1958), affd. 295 F. 2d 336 (5th Cir. 1961); Romer v. Commissioner,28 T.C. 1228, 1243-1245 (1957), and the cases cited therein. Instead, Mr. Jedinak challenges the Commissioner's conclusion that the excess represents current income during each of the years at issue. He contends that a secret cash hoard accounts for approximately *305 $ 85,000 of the excess and that the remainder of the excess is attributable to inaccuracies and duplications in the bank deposits and cash expenditures computation. Based on the entire record, we find no merit in either contention, and we affirmatively find that Mr. Jedinak did not have a significant cash hoard and that the excess bank deposits and cash expenditures is unreported income from his gambling activities.
The only items the petitioners have specifically pointed to as duplicative are four checks drafted by Mr. Jedinak totaling $ 4,600. Each check was drawn on Mr. Jedinak's bank account during 1970. A friend of Mr. Jedinak was the payee on one of the checks, and the other three checks were made payable to cash. The only evidence that these checks were subsequently redeposited in the petitioners' bank accounts is Mr. Jedinak's testimony that these checks were cashed, the cash was placed in his safe at home for a while, and the cash was eventually redeposited in such accounts at some future undisclosed time. We are not persuaded by such testimony. First, all of the deposit slips for the petitioners' checking accounts were in evidence as were all of their monthly bank *306 statements; yet, Mr. Jedinak pointed to no specific entry in such records to support his contention that the proceeds of the checks were redeposited. Second, we have our doubts about whether Mr. Jedinak would have placed $ 4,600 in a safe in his home, especially considering that his home had been burglarized in December 1968 and a safe in his bedroom had been opened with a blowtorch during such burglary. [3] In addition, Mr. Jedinak leased a safe deposit box on October 7, 1970. If Mr. Jedinak had $ 4,600 in cash, it seems to us that such box would have been a much more likely repository than a safe in his bedroom. Accordingly, we find that the Commissioner's bank deposits and cash expenditures computation is not duplicative. The petitioners also argued that $ 85,500 of their bank deposits came from a cash hoard that Mr. Jedinak had accumulated prior to 1964.According to Mr. Jedinak, the cash hoard resulted from the proceeds of the following transactions: Source
Amount
1. Sale of interest in business: a. Melody Lounge
$ 16,600
b. Pittsburgh Telephone
Answering Service (Answering)
18,000
c. Distributors Inc. (Distributors)
10,000
2. Loans: a. Loan against V.A. life insurance
policy
2,200
b. Exchange mortgage, State Capital
Savings and Loan Association
12,500
3. Miscellaneous: a. Franklin life insurance policy
cash surrender value
3,200
b. Prudential life insurance policy
cash surrender value
9,000
c. Savings bonds cashed
14,000
Total
$ 85,500
*307 Mr. Jedinak claimed that he took the proceeds from such transactions and eventually placed them in a tool box in his garage. However, a careful analysis of the various transactions does not support Mr. Jedinak's contention. In the first place, the evidence establishes that several of the items have been grossly inflated. When Mr. Jedinak sold his interest in Answering to his former partners, the dissolution agreement provided that he was to receive $ 14,000, and not $ 18,000, from such sale. In addition, we are not convinced that Mr. Jedinak received $ 12,500 in cash as a result of the exchange mortgage he obtained from State Capital Savings and Loan Association in 1961. The petitioners had mortgaged their house in 1950 for $ 9,000. The evidence does not establish the terms of the 1950 mortgage or how much of it had been paid by 1961; yet, it is clear that a portion of the proceeds from the exchange mortgage was used to satisfy the petitioners' prior mortgage. We also doubt that Mr. Jedinak received $ 14,000 from the sale of savings bonds. Mr. Jedinak testified that all of such bonds were purchased between 1955 and 1959.However, the petitioners had income of only approximately *308 $ 30,000 during such years. We are not willing to believe that they spent almost one-half of their total income to purchase savings bonds during such period. Additionally, the petitioners would have us believe that each transaction was independent from the other transactions and that in 1968, they still retained the proceeds of each of the transactions. However, the chronology of the various transactions provides persuasive evidence that Mr. Jedinak transferred the same funds from business to business. The petitioners acquired Melody Lounge sometime prior to 1955. According to Mr. Jedinak, it was sold in early 1958 for approximately $ 16,600. In May 1958, he invested in Answering. In 1959, Mr. Jedinak sold his partnership interest in Answering for approximately $ 14,000. At about the same time, he invested $ 10,000 in Distributors. In early 1960, he sold his interest in Distributors for approximately $ 10,000, and in May 1960, he invested such amount in a business called Values. Subsequently, in late 1960 or early 1961, Mr. Jedinak applied for an exchange mortgage, and his application was granted in February 1961. During the next several months, Mr. Jedinak acquired a substantial *309 inventory at Values. The timing of these transactions shows that Mr. Jedinak used the proceeds from the sale of one business to invest in a later business venture. Even if this were the only evidence, we would hold that Mr. Jedinak had failed to meet his burden of proving the existence of a cash hoard; but the additional evidence in this case affirmatively establishes that there was no significant cash hoard in 1968. The most telling factor is that Mr. Jedinak declared bankruptcy in 1964 and received a discharge from indebtedness as a direct result of the liabilities of Values. He represented under oath on his bankruptcy petition that he had no cash on hand, that he made no transfers, and that he had gambling losses of about $ 20,000 during 1963. In the trial of this case, Mr. Jedinak testified under oath that such representations were not true and that he perjured himself when he made them. Thus, he has made totally inconsistent statements under oath so that we can place little, if any, reliance on his testimony. Yet, the evidence does establish that Mr. Jedinak incurred large losses as a result of his investment in Values and his gambling activities, and that such events *310 precipitated his bankruptcy in 1964. Such circumstances are sufficient convince us that Mr. Jedinak lost all, or at least a large part, of any cash hoard that he may have accumulated previously. In addition, we have our doubts about his story that he kept large amounts of case in a tool box for years. Finally, the Jedinaks reported only modest income for the years 1965 through 1967--an insufficient amount of income to enable them to accumulate any significant hoard.
At the same time, there is a perfectly reasonable explanation of the excess bank deposits and cash expenditures--they represent unreported income from Mr. Jedinak's gambling activities during each of the years in issue. The fact that most of his deposits were in cash is attributable to his practice of conducting his business on a cash basis. His numbers activities were a fertile enough source of income for Mr. Jedinak to pay protection money of $ 250 per month, or $ 3,000 a year, "to keep away the law." Under these facts, we have no alternative but to conclude that there was no significant cash hoard, that the bank deposits and cash expenditures computation was not duplicative, and that the petitioners had unreported *311 income in the amount determined by the Commissioner. See Shahadi v. Commissioner,266 F. 2d 495 (3d Cir. 1959), affg. 29 T.C. 1157 (1958), cert. denied 361 U.S. 874 (1959); Anderson v. Commissioner,250 F. 2d 242 (5th Cir. 1957), affg. on this issue a Memorandum Opinion of this Court, cert. denied 356 U.S. 950 (1958). Issue 2. Fraud
The next issue for decision is whether any part of the underpayment of taxes for each of the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b). [4]The Commissioner bears the burden of establishing fraud, and he must prove it by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Levinson v. United States,496 F. 2d 651 (3d Cir. 1974), cert. denied 419 U.S. 1040 (1974); Estate of Pittard v. Commissioner,69 T.C. 391 (1977); Estate of Temple v. Commissioner,67 T.C. 143 (1976); *312 Imburgia v. Commissioner,22 T.C. 1002 (1954); Petit v. Commissioner,10 T.C. 1253 (1948). To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Acker v. Commissioner,26 T.C. 107, 112-113 (1956). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Since fraud can seldom be established by direct proof of intention, the taxpayer's entire course of conduct can ofter be relied *313 on to establish circumstantially such fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. Based on the entire record, the evidence overwhelmingly establishes that Mr. Jedinak fraudulently underpaid his taxes during each of the years in issue. He arranged for the preparation of the tax returns, and those returns understanted the petitioners' income by $ 82,860.17 in 1968, $ 31,237.00 in 1969, $ 22,737.12 in 1970, and $ 12,544.48 in 1971. Such a consistent pattern of underreporting substantial amounts of income over a period of several years, standing alone, is persuasive evidence of fraud. *314 Holland v. United States,348 U.S. 121, 139 (1954); Adler v. Commissioner,422 F. 2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Meomorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970); Agnellino v. Commissioner,302 F. 2d 797, 801 (3d Cir. 1962), affg. on this issue a Memorandum Opinion of this Court; Shahadi v. Commissioner,supra at 500-501; Schwarzkopf v. Commissioner,246 F. 2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1139 (1970). We recognize that such principle should be applied with caution where the finding of unreported income is based on the taxpayer's failure to meet his burden of proof in some respect. See Otsuki v. Commissioner,supra at 106; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971). However, our conclusion was not based on the petitioners' failure of proof; based on all the evidence, weaffirmatively found that *315 no significant cash hoard existed in 1968 and that the petitioners' unreported income was derived from Mr. Jedinak's gambling activities. Yet, we need not rely solely on the petitioners' failure to report substantial income, because there are other significant indicia of fraud. On each tax return during the years in issue, Mr. Jedinak falsely stated his occupation as "retired." While he was not required to incriminate himself on his tax return, he undertook to set forth his occupation, and in doing so, he misrepresented it, presumably to conceal the fact that he was engaged in gambling activities. See Goldberg v. Commissioner,36 B.T.A. 44, 53 (1937) affd. 100 F. 2d 601 (7th Cir. 1938), cert. denied 307 U.S. 622 (1939); Dorsey v. Commissioner,33 B.T.A. 295, 299-300 (1935). In addition, the manner in which Mr. Jedinak conducted his gambling business also supports a finding of fraud. All of his gambling transactions were in cash, as were most of his bak deposits. These business practices accomplished two objectives: they minimized the chances of detection by local law enforcement officers, and they made it more difficult *316 to trace unreported income. The fact that Mr. Jedinak's business practices may have been motivated by several considerations does not detract from our conclusion that concealing his income was part of his motivation. "If the tax-evasion motive plays any part in such conduct the offense may be made out even though the conduct may also serve other purpose such as concealment of other crime." Spies v. United States,317 U.S. 492, 499 (1943). Furthermore, we wonder whether Mr. Jedinak's records were actually destroyed. The alleged loss of the records of his gambling business is not consistent with the fact that he was able to produce financial records going back to the 1950's when he thought that such records would be of some benefit to him. Another important indicium of fraud is Mr. Jedinak's evasive conduct during the course of the audit. See Estate of Beck v. Commissioner,56 T.C. at 363; Stone v. Commissioner,56 T.C. at 224; Beaver v. Commissioner,55 T.C. 85, 93 (1970); *317 Otsuki v. Commissioner,53 T.C. at 111. He related a cash hoard story, the particulars of which were dictated by the exigencies of his situation. For example, Mr. Jedinak initially claimed a cash hoard of between $ 50,000 and $ 60,000 when Mr. Barney confronted him with the excess bank deposits. Later, when Mr. Jedinak was informed that such bank deposits exceeded his reported income by approximately $ 85,000, Mr. Jedinak increased his cash hoard to $ 85,500. The composition of the alleged cash hoard also changed. Initially, Mr. Jedinak indicated that a portion of his cash hoard was made up of personal loans but that he could not substantiate such loans because he did not want to be indebted to his creditors by asking them to corroborate that he owed them money. However, the only loans on the list Mr. Jedinak submitted to Mr. Barney were his home mortgage and the loan against his V.A. life insurance policy. Finally, the location of the cash hoard appears to have been a child of necessity. Mr. Jedinak had several bank accounts, a safe in his home, and a safe deposit box; but the stipulated evidence prevented him from claiming he kept his cash hoard in any of these *318 places. The bank records showed that Mr. Jedinak had not placed his cash hoard in any of his bank accounts. Similarly, he did not lease his own safe deposit box until 1970, and according to the access record card, his wife's safe deposit box had not been entered during the years at issue. Moreover, Mr. Jedinak could no longer claim that he kept his cash hoard in the most likely repository, his home safe, because the contents thereof were removed during a burglary in 1968. Hence, he claimed that the alleged cash hoard was in a tool box in his garage. Finally, Mr. Jedinak's willingness to say whatever would benefit him most financially is further evidence of fraud. He stated under oath on his bankruptcy petition that he had made no transfers of property, that he had no cash on hand, and that he had gambling losses of approximately $ 20,000 during 1963. When it was no longer advantageous for him to stand by such statements, he told Mr. Barney that he lied on his bankruptcy petition when he made such representations. At the trial, Mr. Jedinak again stated that he lied on his bankruptcy petition when he said he had gambling losses and that he had no cash on hand. He also testified *319 at trial that he made no transfers of property prior to his bankruptcy. There are so many inconsistencies and admissions of perjury in Mr. Jedinak's testimony that it is difficult to know what to believe, but it is clear that such statements were made with the purpose of concealing his unreported income. Accordingly, we find that part of the underpayment for each of the years at issue was due to fraud on the part of Mr. Jedinak. The Commissioner also argues that part of each underpayment of tax was due to the fraud of Mrs. Jedinak. In support of his contention, the Commissioner asserts that Mrs. Jedinak had knowledge of her husband's gambling activities, that she had access to funds in excess of what she earned as a nurse, and that parts of her testimony were evasive and inconsistent with other evidence presented at the trial. However, under section 6653(b), Mrs. Jedinak is not liable for the fraud penalty unless it is shown that part of the underpayment for each of the years at issue was due to fraud on her part. Fraud may never be imputed or presumed, but must be affirmatively proved. *320 Stone v. Commissioner,56 T.C. at 224. On the basis of the record before us, the Commissioner has not proved by clear and convincing evidence that any part of the underpayment was due to fraud on her part. Mrs. Jedinak had nothing to do with the family finances other than giving her husband her weekly check and signing whatever documents he instructed her to sign. Mr. Jedinak balanced the books, paid the bills, prepared the checks, made the bank deposits, purchased the stock in mutual funds and other corporations, and arranged for the preparation of the tax returns. Mr. Jedinak assumed full financial responsibility for the family, and Mrs. Jedinak did what she was told to do, without realizing how her funds were used and how much income was received by the family. Admittedly, Mrs. Jedinak knew her husband was engaged in the numbers business, but she did not know how successful he was in such business, since they did not live lavishly. In addition, she had no way of knowing that the income reported on their tax returns for the years in issue did not accurately reflect their income. Moreover, we did not find Mrs. Jedinak's testimony evasive. Although there were *321 minor inaccuracies in her testimon, such inaccuracies are explainable by the fact that the various transactions occurred 8 years before the trial. Issue 3. Statute of Limitations
The petitioners conceded that the statute of limitations is no bar to the assessment and collection of deficiencies for the years 1970 and 1971. However, they argue that the statute of limitations is a bar to assessment and collection of the deficiencies for 1968 and 1969. Under section 6501(c), the tax and addition to tax may be assessed at any time where a false or fraudulent return is filed. Since we have already concluded that part of the underpayment of tax for each year at issue was due to fraud with intent to evade tax on the part of Mr. Jedinak, the statute of limitations presents no barrier to the assessment and collection of the deficiencies in this case. Stone v. Commissioner,56 T.C. at 228; Rodney v. Commissioner,53 T.C. 287, 311 (1969); see also sec. 6501(e). Issue 4. Innocent Spouse
The fourth issue for decision is whether Mrs. Jedinak is entitled to be relieved of liability for the deficiencies under *322 section 6013(e)(1) which provides: (e) Spouse Relieved of Liability in Certain Cases-- (1) In general.--Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefitted directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. *323 Mrs. Jedinak bears the burden of proving she has complied with each of the three conditions for each of the years in issue. Rule 142, Tax Court Rules of Practice and Procedure; Quinn v. Commissioner,62 T.C. 223, 229-230 (1974), affd. 524 F. 2d 617 (7th Cir. 1975); Sonnenborn v. Commissioner,57 T.C. 373, 380-382 (1971). Since Mrs. Jedinak has failed to prove that she satisfies the last of such conditions, she is not entitled to relief regardless of whether she has met the other conditions. To meet the requirements of section 6013(e)(1)(C), Mrs. Jedinak was required to prove that, taking into account whether she significantly benefitted from the omissions from gross income, and taking into account all of the other facts and circumstances, it would be inequitable to hold her liable for the deficiencies. During 1968 through 1971, Mr. Jedinak invested the unreported income from his numbers activities in the stock market. All the stocks so acquired were purchased in the joint names of Mr. and Mrs. Jedinak and held by them either as joint tenants or as tenants by the entirety. At the end of 1971, the petitioners jointly owned stocks *324 which had cost tens of thousands of dollars, and as far as we know, such property is still jointly owned by the petitioners.In addition, as of December 31, 1971, there was in excess of $ 4,300 in the petitioners' joint savings accounts. The joint ownership of such property constitutes a significant benefit to Mrs. Jedinak, even if the benefit may not be actually realized until future years, and under these circumstances, it is not inequitable to hold her liable for the deficiency in each year. S. Rept. No. 91-1537 (1970), 1971-1 C.B. 606, 607-608; see Adams v. Commissioner,60 T.C. 300, 304 (1973); Sonnenborn v. Commissioner,57 T.C. at 382. Issue 5. Suppression of Evidence
The final issue for decision is whether there is any basis for suppressing any of the documentary evidence in this case. The petitioners concede that their constitutional rights under the Fourth Amendment and under the self-incrimination clause of the Fifth Amendment to the U.S. Constitution have not been violated. See *325 Gordon v. Commissioner,63 T.C. 51, 63-72 (1974), affd. on this issue 572 F. 2d 193 (9th Cir. 1977), cert. denied     U.S.     (March 28, 1978); Harper v. Commissioner,54 T.C. at 1130-1138. Nevertheless, they argue that revenue agent Barney was required to warn them of "their rights," and that since such warning was not given, all of the evidence in this case should be suppressed in the interest of "Internal Revenue Policy and fair play." As authority for such proposition, they cite IRS Announcement 68-82, 1968-51 I.R.B. 54; United States v. Leahey,434 F. 2d 7 (1st Cir. 1970); United States v. Heffner,420 F. 2d 809 (4th Cir. 1969); and United States v. Wohler,382 F. Supp. 229 (N.D. Utah 1973). We find no merit in such argument. IRS Announcement 68-82 provides: PROCEDURE FOR ADVISING TAXPAYERS OF RIGHTS IN FRAUD PROBES The Internal Revenue Service announces changes in the procedure for advising taxpayers of their rights during an investigation conducted by a Special Agent of the Service Intelligence Division. The new procedure goes beyond most *326 legal requirements that are designed to advise persons of their rights. One function of a Special Agent is to investigate possible criminal violations of internal revenue laws. At the initial meeting with a taxpayer, a Special Agent is now required to identify himself, describe his function, and advise the taxpayer that anything he says may be used against him. The Special Agent will also tell the taxpayer that he cannot be compelled to incriminate himself by answering any questions or producing any documents, and that he has the right to seek the assistance of an attorney before responding. Previously, the Special Agent identified himself and described his function at the first meeting with the taxpayer but was not required to give further advice unless the taxpayer was in custody or the investigation proceeded beyond the preliminary stage. The Service has made no change in its existing instructions that if it becomes necessary to interview a person who is in custody, an Agent must give a comprehensive statement of rights before any interrogation. This statement warns the person in custody that he may remain silent and that anything he says may be used against him. *327 A person in custody also must be told that he has the right to consult or have present his own counsel before making a statement or answering any questions, and that if he cannot afford counsel he can have one appointed by the U.S. Commissioner. Clearly, such procedure only applies to special agents conducting investigations on behalf of the Intelligence Division in a criminal fraud proceeding and therefore was not applicable to the activities of revenue agent Barney. Likewise, the cases cited by the petitioners have nothing whatsoever to do with the assessment of a civil fraud penalty under section 6653(b), resulting from a civil tax audit conducted by a revenue agent. Moreover, in view of the evidence, it is clear that the petitioners have no basis for complaint. Though the investigation of their tax returns for the years in issue originated in the Intelligence Division, the petitioner were represented by an attorney during such investigation. They do not allege any impropriety with respect to that phase of the proceeding. Once the Intelligence Division declined to pursue a criminal investigation of the Jedinaks, revenue agent Barney was assigned to conduct a civil audit. *328 As soon as he suspected civil fraud, he informed the petitioners that the civil fraud penalty under section 6653(b) would be assessed. Not until Mr. Jedinak informed him of his bankruptcy in 1964 did revenue agent Barney suspect criminal fraud. At this point, he referred Mr. Jedinak's case to the Intelligence Division, which again declined to make a criminal investigation of the Jedinaks. Thereafter, revenue agent Barney resumed his civil audit.We find nothing offensive to notions of "fair play" in this sequence of events. In conclusion, we hold that both petitioners are liable for the deficiencies in income tax for each of the years 1968 through 1971; that Mr. Jedinak is liable for the fraud penalty for each of such years; and that Mrs. Jedinak is not liable for such penalty. To reflect concessions by the Commissioner and our conclusions, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. Mr. Jedinak had a savings account at Arizona Savings and Loan Association. However, all of the deposits in that account were traced to the petitioners' checking accounts at PNB.↩
3. There is no evidence that the petitioners had the safe repaired or replaced.↩
4. (b) Fraud.--If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * In the case of a joint return under section 6013↩, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse.